

# NUMBER 13-14-00402-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

CONOCOPHILLIPS COMPANY,
BURLINGTON RESOURCES OIL
& GAS CO., L.P., AND LOIS STRIEBER,
INDIVIDUALLY AND AS EXECUTRIX OF
THE ESTATE OF JERRY STRIEBER                    **Appellants,**

**v.**

RALPH WADE KOOPMANN,
KAREN MARIE KOENIG, AND
LORENE H. KOOPMANN                              **Appellees**

### On appeal from the 24th District Court
### of De Witt County, Texas.

# MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Rodriguez and Longoria
### Memorandum Opinion by Chief Justice Valdez

This case concerns ownership of a non-participating royalty interest[1] (NPRI) in the gross production of oil and gas covering a tract of land located in Dewitt County, Texas. On competing motions for summary judgment, the trial court entered a declaratory judgment stating that the NPRI is owned by the appellees/cross-appellants Ralph Wade Koopmann, Karen Marie Koenig, and Lorene H. Koopmann (the Koopmanns) and not appellant Lois Strieber, individually and as executrix of the state of Jerry Strieber. Also on summary judgment, the trial court dismissed certain claims brought by the Koopmanns against appellants/cross-appellees Burlington Resources Oil & Gas Co., L.P. (Burlington) and ConocoPhillips Company (ConocoPhillips). We affirm in part and reverse and remand in part.

## I.    FACTUAL BACKGROUND

By warranty deed dated December 27, 1996, Strieber conveyed the surface and mineral estate of a 120-acre tract of land to the Koopmanns. As per the deed, Strieber reserved for herself the NPRI at issue for a period of fifteen years, or until December 27, 2011, and for "as long thereafter as there is production [of oil, gas, or minerals from the land] in paying or commercial quantities." The deed also contained a "savings clause," allowing for Strieber's NPRI to be preserved beyond December 27, 2011 without actually producing oil, gas, or minerals from the land. Specifically, the deed's savings clause provided that:

> [I]f any oil, gas, or mineral or mining lease covering [the Koopmanns' land] is maintained in force and effect by payment of shut-in royalties or any other similar payments made to [the Koopmanns] in lieu of actual production while

---

[1] A nonparticipating royalty interest, or NPRI for short, is an interest in the gross production of oil, gas, and other minerals below the surface of land. *See Plainsman Trading Co. v. Crews*, 898 S.W.2d 786, 789–90 (Tex. 1995). The owner of the NPRI may receive royalties from the gross production of oil, gas, and other minerals but may not participate in the execution of any oil, gas, and mineral lease. *Id.*

2

there is located on [the Koopmanns' land] a well or mine capable of producing oil, gas, or other minerals in paying or commercial quantities but shut-in for lack of market or any other reason, then for purposes of determining [whether Strieber's NPRI continues beyond December 27, 2011,] it will be considered that production in paying or commercial quantities is being obtained from the [Koopmanns' land].

In 2007, the Koopmanns entered into a three-year lease with Burlington, an oil and gas company, for the purpose oil and gas exploration and development under their land. In 2010, with a few months remaining on the three-year lease, ConocoPhillips, Burlington's parent company, paid the Koopmanns $24,000 to extend Burlington's lease for an additional two years, or until October 2012.

By August 2011, Strieber's initial fifteen-year NPRI term under the deed was four months away from terminating in December 2011, and Burlington had not been able to produce oil and gas from the Koopmanns' land. As an incentive to accelerate the drilling process, Strieber offered Burlington a 60% interest in her NPRI, which Burlington accepted. As such, Strieber and Burlington then owed 40% and 60% of the NPRI, respectively.

Thereafter, Burlington identified a well site on the Koopmanns' land and began a process called "hydraulic fracturing" to complete the drilling of a well. On December 7, 2011, ConocoPhillips, on behalf of Burlington, sent a letter informing the Koopmanns that a well was anticipated to begin producing oil and gas in the first quarter of 2012. Noting the deed's savings clause, ConocoPhillips enclosed a shut-in royalty payment, which, according to the letter, was being tendered to the Koompanns to "ensure that all parties' interest, if any, in the well [was] maintained." However, the Koopmanns promptly returned this shut-in royalty payment to ConocoPhillips.

3

The summary judgment evidence is undisputed that no well actually produced oil, gas, or minerals from the land until February 2012, which is some two months after Strieber's initial fifteen-year NPRI term ended on December 27, 2011. Although there was no production by December 27, 2011, Burlington and ConocoPhillips' expert, Joseph Rhodes, determined that the well was at least *capable* of producing as early as December 16, 2011—thus implicating the savings clause. The Koopmanns, on the other hand, sponsored their own expert, Peter Huddleston, who disagreed with Rhodes' conclusion that the well was capable of producing before December 27, 2011—thus negating the savings clause. All royalties attributable to the NPRI have been withheld from the Koopmanns since the well began producing.

## II. PROCEDURAL BACKGROUND

The Koopmanns brought a declaratory action against Strieber, Burlington, and ConocoPhillips to be declared the owners of the NPRI. The Koopmanns also brought several non-declaratory claims against Burlington and ConocoPhillips for withholding royalties on the NPRI and for tendering a shut-in royalty payment on December 7, 2011.[2] At an early juncture in the proceedings below, the litigation leading to this appeal fractured along two major fault lines; a first cluster of litigation related to the Koopmanns' request for a declaratory judgment concerning ownership of the NPRI, and a second involved litigation relating to the Koopmanns' non-declaratory claims against Burlington and ConocoPhillips.

---

[2] With the Koopmanns seeking a declaratory judgment that they owned the NPRI, Strieber brought her own cross-claim against Burlington and ConocoPhillips for breach of contract. Strieber asserted that if her NPRI was found to have terminated, then Burlington and ConocoPhillips breached an alleged oral agreement in 2011 when they failed to secure a producing well by December 27, 2011, as allegedly promised.

4

**A. Litigation Relating to the Koopmanns' Request for Declaratory Judgment**

Concerning the first cluster of litigation, the Koopmanns sought a declaration from the trial court that they owned the NPRI as of December 27, 2011. In response to the Koopmanns' declaratory action, Strieber, Burlington, and ConocoPhillips moved for summary judgment to have the trial court declare that the NPRI remained in Strieber. They contended, among other things, that Strieber's reservation of the NPRI for fifteen years, and for as long thereafter as there is production, created a future interest in the Koopmanns that violates the rule against perpetuities. They reasoned that because the Koopmanns' future interest is void under the rule against perpetuities, the NPRI stayed with Strieber. In the alternative, they asserted that the deed's saving clause applies to preserve Strieber's NPRI beyond December 27, 2011 even without actual production.

In a competing motion, the Koopmanns moved for summary judgment to have the trial court declare that they own the NPRI. The Koopmanns argued that the savings clause did not apply to preserve Strieber's interest in the NPRI beyond December 27, 2011, and the rule against perpetuities did not apply to void the NPRI. Agreeing with the Koopmanns, the trial court entered a summary judgment declaring that:

1. As of December 27, 2011, there were no wells actually producing in paying or commercial quantities;

2. The NPRI was null and void;

3. Strieber's and Burlington's right to the NPRI terminated; and

4. The Koopmanns were entitled to the full amount of any royalty payments due under the NPRI.

Although the trial court granted a declaratory judgment in favor of the Koopmanns, it did not award them interest on unpaid royalties attributable to the NPRI.

5

**B. Litigation Relating to the Koopmanns' Non-Declaratory Claims against Burlington and ConocoPhillips**

Concerning the second cluster of litigation, the Koopmanns brought claims against Burlington and ConocoPhillips under contract, quasi-contract, and tort theories. The relevant non-declaratory claims include: (1) breach of contract, (2) unjust enrichment/money had and received,[3] (3) conversion, (4) negligence, and (5) negligence per se. Specifically, the Koopmanns alleged the following:

1. Burlington withheld royalties attributable to the NPRI from the Koopmanns in breach of their lease agreement [i.e., breach of contract].

2. ConocoPhillips, though not a signatory to the lease agreement, unjustly enriched itself by receiving royalties owed to the Koopmanns [i.e., unjust enrichment/money had and received].

3. Burlington and ConocoPhillips converted royalties legally owned by and payable to the Koopmanns [i.e., conversion].

4. Burlington and ConocoPhillips were negligent in the performance of the lease [i.e., negligence].

5. Burlington and ConocoPhillips were negligent per se in the performance of the lease by violating section 91.402 of the Texas Natural Resources Code [i.e., negligence per se].

**1. Burlington and ConocoPhillips Move to Dismiss the Koopmanns' Non-Declaratory Claims Under Texas Rule of Civil Procedure 91a.**

Seeking early dismissal of the above-mentioned claims, Burlington and ConocoPhillips filed a motion to dismiss pursuant to Texas Rule of Civil Procedure 91a. *See* TEX. R. CIV. P. 91a.3. In support of their motion to dismiss, Burlington and ConocoPhillips asserted that all of the Koopmanns' claims were barred as a matter of law

---

[3] Money had and received is an equitable doctrine to prevent unjust enrichment. *See Amoco Prod. Co. v. Smith*, 946 S.W.2d 162, 164 (Tex. App.—El Paso 1997, no writ). For purposes of our discussion, our analysis addressing the unjust enrichment claim applies equally to the claim for money had and received.

under section 91.402(b) of the Texas Natural Resources Code because ownership of the NPRI was in dispute. *See* TEX. NAT. RES. CODE ANN. § 91.402(b) (West, Westlaw through 2015 R.S.). Aside from the natural resources code, Burlington and ConocoPhillips also sought dismissal of the Koopmanns negligence claims under the "economic loss rule." After considering these arguments, the trial court denied the motion to dismiss and awarded attorney's fees to the Koopmanns under Rule 91a.7. *See* TEX. R. CIV. P. 91a.7 (providing that the trial court must award attorney's fees to the "prevailing party" on a motion to dismiss).

### 2. Burlington and ConocoPhillips Move to Dismiss the Koopmanns' Non-Declaratory Claims on Summary Judgment

Burlington and ConocoPhillips again moved to dismiss the same claims targeted by their Rule 91a motion to dismiss, this time on summary judgment. In support of summary judgment, Burlington and ConocoPhillips re-urged some of the same arguments that they asserted in their Rule 91a motion to dismiss but also raised a new set of arguments as well. This time, the trial court granted summary judgment and dismissed all of the Koopmanns non-declaratory claims.[4] This appeal followed.

### III.  DECLARATORY JUDGMENT

By their first issue, Strieber, Burlington, and ConocoPhillips contend that the trial court erred in declaring on summary judgment that Strieber's NPRI terminated on December 27, 2011.

---

[4] After resolving the Koopmanns lawsuit through final summary judgments, the trial court severed Strieber's cross-claim against Burlington and ConocoPhillips, which placed Strieber's cross-claim on a trajectory for trial pending this appeal. In addition to challenging the trial court's declaratory judgment in favor of the Koopmanns, Strieber individually appeals the trial court's severance order.

7

## A. Standard of Review

Declaratory judgments decided by summary judgment are reviewed under the same standards of review that govern summary judgments generally. *See Lidawi v. Progressive Cnty. Mut. Ins. Co.*, 112 S.W.3d 725, 730 (Tex. App.—Houston [14th Dist.] 2003, no pet.). We review the trial court's summary judgment de novo. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Knott*, 128 S.W.3d at 215; *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). When, as here, both parties move for summary judgment on the same issue and the trial court grants one motion and denies the other, we consider the summary judgment evidence presented by both sides, determine all questions presented, and if we determine that the trial court erred, render the judgment the trial court should have rendered. *See FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000).

## B. Discussion

In order to declare on summary judgment that the Koopmanns own the NPRI, the trial court had to find both: (1) that the deed's savings clause conclusively did not apply to preserve Strieber's interest in the NPRI beyond December 27, 2011; and (2) that the rule against perpetuities conclusively did not apply to void the NPRI. We address each finding separately below.

### 1. Savings Clause

As per the deed, Strieber's interest in the NPRI was subject to termination on December 27, 2011 unless (1) there was actual production occurring on the Koopmanns'

8

land on or before that date, or (2) the savings clause applied to excuse the requirement of actual production after that date. Because it is undisputed that no well was actually producing by December 27, 2011, the parties agree that Strieber's interest in the NPRI continued beyond that date only if the savings clause applied. Again, the savings clause specifically provides that

> [I]f any oil, gas, or mineral or mining lease covering [the Koopmanns' land] is maintained in force and effect by payment of shut-in royalties or any other similar payments made to [the Koopmanns] in lieu of actual production while there is located on [the Koopmanns' land] a well or mine capable of producing oil, gas, or other minerals in paying or commercial quantities but shut-in for lack of market or any other reason, then for purposes of determining [whether Strieber's NPRI continues beyond December 27, 2011,] it will be considered that production in paying or commercial quantities is being obtained from the [Koopmanns' land].

This savings clause contains three key requirements: (1) the lease requirement; (2) the capable-well requirement; and (3) the shut-in-royalty-or-similar-payment requirement. According to Strieber, Burlington, and ConocoPhillips, all three requirements were satisfied on December 27, 2011. First, Burlington had a lease covering the Koopmanns' land—thus satisfying the lease requirement.[5] Second, Burlington shut-in a well that was capable of producing on or before December 27, 2011—thus satisfying the capable-well requirement.[6] And third, Burlington paid $24,000 to extend the lease until October 2012, which is "similar" to a shut-in royalty—thus satisfying the shut-in-royalty-or-similar-payment requirement.

---

[5] The parties do not dispute that the lease requirement was satisfied.

[6] The parties' respective experts, Rhodes and Huddleston, reached different conclusions concerning whether the well was capable of producing on or before December 27, 2011. We find that both witnesses offered admissible summary judgment testimony. Because the summary judgment evidence does not conclusively establish or negate the well's capability, it is a fact question left for the jury. *See Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex. 1991).

Setting aside the first and second requirements, the Koopmanns respond that the summary judgment evidence conclusively negates the third requirement and therefore renders the savings clause inapplicable to preserve Strieber's interest in the NPRI beyond December 27, 2011. Specifically, the Koopmanns assert that the $24,000 payment extending the lease is not "similar" to a shut-in royalty as a matter of law. The question therefore becomes one of contract interpretation to ascertain the meaning of the term "similar" as it relates to shut-in royalties in the deed's savings clause.

### (i)      Contract Interpretation Principles

Our primary concern in construing a contract or deed is to ascertain and give effect to the true intentions of the parties as expressed in the text of the agreement. *El Paso Field Services, L.P. v. MasTec North Am., Inc.*, 389 S.W.3d 802, 805 (Tex. 2012); *Carbona v. CH Med., Inc.*, 266 S.W.3d 675, 680 (Tex. App.—Dallas 2008, no pet.). To achieve this objective, we examine and consider "the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). Contract terms are given "their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense." *Valence Operating*, 164 S.W.3d at 662*.*

If a contract can be given a certain or definite legal meaning, then the contract is not ambiguous and we will construe it as a matter of law. *El Paso Field Servs.*, 389 S.W.3d at 806. However, if a contract is susceptible to two or more reasonable

10

interpretations, then the contract is ambiguous. *J.M. Davidson*, 128 S.W.3d at 229; *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006). When a contract is ambiguous, the granting of a motion for summary judgment is usually improper because the intent of the contracting parties is an issue of fact for the jury to decide. *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983); *Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Ass'n*, 205 S.W.3d 46, 56 (Tex. App.—Dallas 2006, pet. denied).

**(ii)    Applicable Law**

An oil and gas lease conveys to a lessee a determinable fee to all oil and gas below the surface of the land covered by the lease. *Cherokee Water Co. v. Forderhause*, 641 S.W.2d 522, 525 (Tex. 1982); *ExxonMobil Corp. v. Valence Operating Co.*, 174 S.W.3d 303 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). Oil and gas leases are divided into two separate time periods, known as the primary and the secondary term. *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002).

**(a) The Primary Term**

The primary term lasts for a set number of years, which allows the lessee to explore, develop, and establish oil and gas production. However, if drilling operations do not commence during the primary term, the lessee must pay a fee to the lessor for the delay. This fee is called a delay rental. *See* A. Leopold, 4 TEX. PRACTICE SERIES: LAND TITLES & TITLE EXAMINATION § 23.54 n.3 (3d ed. 2005). A delay rental is a periodic payment by the lessee for the privilege of deferring exploration and production during the primary term of a lease. *Id.* Delay rentals usually must be paid on the anniversary date of the lease's primary term or the lease automatically terminates. Conventional oil and

11

gas leases require a lessee to pay delay rentals annually during the primary term. However, in what is called a "paid-up" lease, the rentals are paid at the time the lease is executed. TEX. LAW OF OIL & GAS §4.3[A][3].

> [A] "paid-up" lease . . . contains no provision for the payment of delay rentals. The rentals are paid when the lease is executed, and this single payment maintains the lease during the primary term. . . . By paying the entire rental up-front, the lessee is relieved of the requirement of annual payments . . .

*Id.; see also* B. Kramer, *Keeping Leases Alive in the Era of Horizontal Drilling and Hydraulic Fracturing: Are the Old Workhorses* (*Shut-in, Continuous Operations, and Pooling Provisions*) *Up to the Task?*, 49 WASHBURN L.J. 283, 284 (2010).

### (b) The Secondary Term

If oil and gas production is established by the end of the primary term, the lease will continue into its secondary term and will usually last for as long thereafter as such production continues. *See Anadarko Petroleum Corp.*, 94 S.W.3d at 556. However, even if production does not occur by the end of the primary term, the lease may contain a special provision that operates to maintain the lease in force or carry it into the secondary term. This special provision in the lease is known as the savings clause.

A savings clause is structured to maintain a lease in lieu of actual production in a variety of scenarios. One such scenario occurs when the lessee manages to drill a well that is *capable* of producing oil and gas before the end of the primary term, but the well cannot be utilized because no market is available to sell the product. *See id.*; A. Leopold, 3A TEX. PRACTICE SERIES: LAND TITLES & TITLE EXAMINATION § 14.22.50 (3d ed. 2015) (citing *In re Estate of Slaughter*, 305 S.W.3d 804 (Tex. App.—Texarkana 2010, no pet.)). In that situation, the lessee may elect to pay a sum of money to the lessor to keep the

12

lease maintained during periods of nonproduction until a market opens. *Id.* This payment is called a shut-in royalty. *Id.*

"Most law concerning payment of shut-in royalties has developed by analogy to delay rentals." *See* A. Leopold, 4 TEX. PRACTICE SERIES: LAND TITLES & TITLE EXAMINATION § 23.54 n.3. Delay rentals are "periodic payments (usually annual) by the lessee for the privilege of deferring exploration during the primary term." *Id.* Similarly, shut-in royalties are "periodic payments for the privilege of deferring exploration and production after the primary term." *Id.* "Failure to make either of these payments properly, usually results in automatic termination of the lease." *Id.*

### (iii) Analysis

In this case, the savings clause in the 1996 deed specifically provides that shut-in royalties are not the exclusive payment-method for maintaining a lease; instead, payments "similar" to shut-in royalties are equally acceptable.

The parties do not dispute that Burlington secured a paid-up lease by paying $24,000 to extend the primary term of the lease until October 2012; nor do the parties dispute that this payment maintained Burlington's lease in force and effect on December 27, 2011—i.e., at the end of Strieber's initial fifteen-year NPRI term. Instead, the disputed issue centers on whether a payment made to secure a paid-up lease is "similar" to a shut-in royalty payment.

According to Strieber, Burlington, and ConocoPhillips, a paid-up lease is similar to a shut-in royalty because both are payments from a lessee to a lessor to maintain a lease in lieu of actual production. Furthermore, they contend that both payments are permitted by a specific clause in an existing lease for the purpose of allowing the lessee to maintain

the lease, at the lessee's option, for a specific period of time by paying the lessor a predetermined sum of money not measured by production. Finally, they contend that both payments operate as conditions subsequent because the lease automatically terminates if payments are not timely made. In essence, they argue that a paid-up lease is too "similar" to be considered different from a shut-in royalty, and therefore, the savings clause's third requirement is satisfied.

In contrast, the Koopmanns argue that a paid-up lease is too different to be considered "similar" to a shut-in royalty. Specifically, the Koopmanns contend that although both payments are made during periods of nonproduction and serve to maintain a lease, a paid-up lease only secures the lessee's right to explore and develop during the primary term—whereas a shut-in royalty is paid after a well is completed and ready to produce but shut-in for lack of market. In other words, a paid-up lease is tied to exploration during the primary term whereas a shut-in royalty is tied to production when a well capable of producing is shut-in after the primary term. Although the Koopmanns maintain that a paid-up lease is different from a shut-in royalty, they provide no example of the type of payment that would be similar to a shut-in royalty.

We note that in analyzing whether a paid-up lease is similar to a shut-in royalty, the issue is not whether we believe that the interpretation advanced by one party is more reasonable or less reasonable than the interpretation advanced by the other party; instead, the issue is whether both interpretations satisfy a threshold of reasonableness sufficient to conclude that the savings clause is ambiguous on the question of whether a paid-up lease is similar to a shut-in royalty. Guided by this perspective, we conclude that

14

the savings clause is susceptible to at least two different reasonable interpretations. *See*

*J.M. Davidson*, 128 S.W.3d at 229; *Seagull Energy E & P, Inc.*, 207 S.W.3d at 345.

Most notably, a paid-up lease can be similar to (or different from) a shut-in royalty depending on the criteria used to compare the two types of payments. For example, if the criteria used to compare these payments focuses on *when* a shut-in royalty is typically paid during the life of a lease, then a paid-up lease is different from a shut-in royalty because a paid-up lease is paid in the primary term—whereas a shut-in royalty is usually paid during the secondary term. If, on the other hand, the criteria used to compare these payments focuses on *what* a shut-in royalty accomplishes during the life of a lease, then a paid-up lease is similar to a shut-in royalty—since both payments are made during times of nonproduction for the purpose of maintaining a lease in force and effect. The ambiguity appears to stem from the fact that the savings clause does not circumscribe the criteria for comparing these two types of payments, for example, by defining the term "similar" or by listing, describing, or otherwise specifying what types of payments would be similar to a shut-in royalty.[7]

---

[7] The Koopmanns further contend that the savings clause does not apply even if a paid-up lease is similar to a shut-in royalty. Referencing the placement of the modifier "while" in the savings clause, the Koopmanns assert that Burlington's payment to secure the paid-up lease literally had to be made "while" a capable well existed on the Koopmanns' property. Relying on this interpretation, the Koopmanns point out that the undisputed summary judgment evidence showed that Burlington paid for the paid-up lease before (not while) a capable well existed on their land, and therefore, the savings clause did not apply. However, in order to accept this interpretation, we would have to find that the parties in 1996 intended a future lessee in Burlington's shoes to accomplish the impossible—by requiring the lessee to somehow shut-in a capable well on or before the day that it paid for the right to explore and discover oil and gas. *See Citizens Nat'l Bank in Abilene v. Tex. & P. Ry. Co.*, 150 S.W.2d 1003, 1007 (Tex. 1941) (observing that a contract will not be presumed to have imposed an impossible condition on one of the parties); *DeNucci v. Matthews*, 463 S.W.3d 200, 217 (Tex. App.—Austin 2015, no pet.); *see also Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 63 (Tex. 2015) (observing that courts avoid a contract interpretation that is unreasonable, inequitable, and oppressive whenever possible and appropriate). To the extent that a paid-up lease is similar to a shut-in royalty, the only reasonable interpretation of the word "while" as used the savings clause is that it modifies the lease requirement—meaning that a capable well must exist while the paid-up lease is maintained in force and effect, regardless of whether or not a capable well existed at the exact moment in time that the lessee paid for the paid-up lease.

As previously mentioned, when a contract is ambiguous, the granting of a motion for summary judgment is usually improper because the intent of the contracting parties is an issue for the factfinder to determine. *Coker*, 650 S.W.2d at 394; *Hackberry Creek*, 205 S.W.3d at 56. Here, the trial court improperly granted summary judgment over an ambiguous deed. *Coker*, 650 S.W.2d at 394; *Hackberry Creek*, 205 S.W.3d at 56.

## 2. Rule Against Perpetuities

Notwithstanding the fact issue created by the ambiguous savings clause, Strieber, Burlington, and ConocoPhillips request that we reverse the trial court and render a judgment that the Koopmanns' interest in the NPRI violates the rule against perpetuities and is therefore void.

### (i) Generally Applicable Law

The Texas constitution states that "[p]erpetuities . . . are contrary to the genius of a free government, and shall never be allowed." TEX. CONST. art. I, § 26. The rule against perpetuities states that no interest is valid unless it must vest, if at all, within twenty-one years after the death of some life or lives in being at the time of the conveyance. *See Peveto v. Starkey*, 645 S.W.2d 770, 772 (Tex. 1982). This prohibition is based on the policy that society's best interests are served by promoting the circulation of property in commerce. Eugene Kuntz, *The Rule Against Perpetuities and Mineral Interests*, 8 OKLA. L. REV. 183, 183 (1955). The rule against perpetuities prevents property interests, including mineral interests, from being tied up for such a long period of time that confusion results and free alienation of potentially oil-rich land is thwarted. Nelson Roach, *The Rule Against Perpetuities: The Validity of Oil & Gas Top Leases & Top Deeds in Tex. After Peveto v. Starkey*, 35 BAYLOR L. REV. 399, 408 (1983).

16

The word "vest" in the rule refers to an immediate, fixed right of present or future enjoyment of the interest. *Peveto*, 645 S.W.2d at 772. The interest may vest in interest before it vests in possession. *See Hunt v. Carroll*, 157 S.W.2d 429, 436 (Tex. Civ. App.—Beaumont 1941, writ dism'd). A conveyance challenged under the rule against perpetuities must be "viewed as of the date the instrument is executed, and it is void if by any possible contingency the grant or devise could violate the [r]ule." *Peveto*, 645 S.W.2d at 772.

**(ii)    Analysis**

Here, the deed reserves the NPRI at issue in Strieber for fifteen years and for as long thereafter as production continues, and when production ceases, the NPRI automatically goes to the Koopmanns. Strieber, Burlington, and ConocoPhillips contend that the NPRI reserved in Strieber for as long as production continues creates a "springing executory interest" in the Koopmanns, which is void under the rule against perpetuities.

**a.  *Bagby***

Our sister court in *Bagby* rejected this very argument based on a nearly identical reservation in a deed. *Bagby v. Bredthauer*, 627 S.W.2d 190 (Tex. App.—Austin 1981, no writ). In *Bagby*, as here, the grantor reserved a royalty interest for fifteen years, and for as long thereafter as production continues. *Id.* at 193. The court held that this reservation created a future interest in the grantee that did not violate the rule against perpetuities. *Id.* at 198.

In applying the language in the deed to the facts before it, the *Bagby* court noted that the rule against perpetuities "relates only to the vesting of estates and interests and has no bearing upon the duration of the estate or the actual possession of it"; that "the

17

estate or interest may vest in interest before it vests in possession"; and that where an instrument is capable of two constructions, preference is given to the construction that will uphold the instrument. *Id.* at 194.

In applying those basic principles, the *Bagby* court noted that a Texas landowner may create a royalty interest by "grant, reservation, or exception." *Id.* at 194–95. The court recognized that a "grant" of a royalty interest creates in the grantee a fee simple determinable, and establishes in the grantor a possibility of reverter. *Id.* at 195. A "possibility of reverter" is the real property "term of art for what the grantor owns as a future interest in a determinable fee grant; it is the grantor's right to fee ownership in the real property reverting to him if the condition terminating the determinable fee occurs." *Luckel v. White*, 819 S.W.2d 459, 464 (Tex. 1991). For example, when the grantor grants an NPRI to the grantee for a term of years and for as long thereafter as production continues, the grantor retains a possibility of reverter in the NPRI that is conditioned on the cessation of production. *See Bagby*, 627 S.W.2d at 195. The *Bagby* court correctly observed that the grantor's possibility of reverter following the termination of a determinable fee interest in the grantee does not violate the rule against perpetuities. *Id.* The question then became whether a grantor's "reservation" of an NPRI on a determinable fee basis violates the rule against perpetuities when the same interest would be valid if created by "grant." *Id.* The *Bagby* court saw no basis for a distinction, concluding that "a reservation is the creation, by and in behalf of the grantor, of a new right issuing out of the thing granted—something which did not exist as an independent right before the grant, a taking back of a part of the thing already granted." *Id.* The *Bagby* court explained that when, as here, two estates are created in one instrument, it is implied

that the original grantor conveyed the entire surface and mineral estate to the grantee, who in turn "re-granted" to the grantor a defeasible term royalty interest that the grantor intended to reserve. *Id.* at 195–96.

This has become known as the "two-grant" theory. The reason for the name is that the grantor's reservation of a royalty interest, such as an NPRI, in a single deed actually implies two grants: (1) a grant of a fee simple absolute of the entire estate to the grantee; and (2) a re-grant of the royalty interest back to the grantor—thus creating in the original grantee a possibility of reverter not voided by the rule against perpetuities. *See id.* Whether effectuated by one grant or two grants, the end result under *Bagby* is that the grantor's reservation of a defeasible term royalty interest creates a future interest in the grantee that does not violate the rule against perpetuities. *See id.*

We are persuaded by the reasoning in *Bagby* and adopt it for purposes of our discussion here. Like the deed language in *Bagby*, the express language of the deed in this case demonstrates that Strieber and the Koopmanns intended that the grantor (i.e., Strieber) would reserve the NPRI for the period of time indicated in the deed and that, upon termination of such interest, the royalty interest would become immediately vested in possession in the grantees (i.e., the Koopmanns) without necessity of any further conveyance. The fact that the Koopmanns' interest may not vest in possession until some uncertain time in the future does not run afoul of the rule against perpetuities. *See Hunt*, 157 S.W.2d at 436. We conclude, as did our sister court in *Bagby* on nearly identical facts, that Strieber's reservation of the NPRI creates a future interest in the Koopmanns that does not violate the rule against perpetuities. *See Bagby*, 627 S.W.2d at 198; *see also Walker v. Foss*, 930 S.W.2d 701, 705 (Tex. App.—San Antonio 1996, no writ)

19

(observing that the grantor's royalty reservation for as long as production continues is not a perpetuities problem).

### b. Under *Bagby's* two-grant theory, does Burlington have a Leasehold on the Koopmanns' Possibility of Reverter in the NPRI?

Strieber, Burlington, and ConocoPhillips argue that *Bagby* is a double-edged sword that ultimately cuts against the Koopmanns. Specifically, they contend that *Bagby's* two-grant theory may avoid a perpetuities problem by classifying the Koopmanns' interest in the NPRI as a possibility of reverter; however, they argue that the logical sequence of this two-grant theory is that the Koopmanns conveyed the possibility of reverter along with the rest of the mineral estate to Burlington when they executed an oil and gas lease with Burlington.[8] They contend that even assuming that Strieber lost the NPRI on December 27, 2011, the NPRI reverted not to the Koopmanns, but instead to Burlington because Burlington currently has a leasehold on the Koopmanns' mineral estate, which, according to them, includes the possibility of reverter. They assert that under this formulation, Burlington has the exclusive right to receive all royalties attributable to the NPRI—perhaps even to the exclusion of Strieber. However, this argument is based on the incorrect premise that Burlington has a leasehold on the Koopmanns' possibility of reverter in the NPRI.

In a typical oil and gas lease, the lessee acquires ownership of all the minerals in place that the lessor owned—subject to the lessor's possibility of reverter in the minerals when the lease terminates. *See Nat. Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 192 (Tex. 2003). The lessor is entitled to, among other things, royalties on production as

---

[8] In other words, Strieber, Burlington, and ConocoPhillips assert that Burlington acquired the possibility of reverter in 2010 when Burlington renewed its oil and gas lease for an additional two years, or until October 2012.

part of the consideration for the lease. *See Concord Oil Co. v. Pennzoil Expl. & Prod. Co.*, 966 S.W.2d 451, 460 (Tex. 1998). When the Koopmanns extended their lease with Burlington in 2010, they effectively: (1) conveyed ownership of the minerals to Burlington for a determinable fee lease term; (2) reserved the right to receive a percentage of royalties on production under the lease; and (3) retained a possibility of reverter in the minerals upon termination of the lease. *See id.* The question is whether the Koopmanns' possibility of reverter in the NPRI is (1) a component of the minerals that the Koopmanns conveyed to Burlington under the lease, or (2) a component of the royalty interest that the Koopmanns retained for themselves.[9] We conclude that the possibility of reverter is a component of the royalty interest that the Koopmanns retained.

First, as per the language of the deed, the Koopmanns' right of reverter in the NPRI includes "one-half of the royalties" from production on their land. It is undisputed that when Strieber executed the deed in 1996, the land was not leased or producing oil and gas. As such, the amount of royalties under the NPRI was to be determined and calculated based upon the royalties reserved by the Koopmanns in a future oil and gas lease. Given these circumstances, the NPRI is properly classified as a fraction-of-royalty interest because it was intended to "float" with (or follow) royalties reserved by the Koopmanns in a future oil and gas lease. *See Coghill v. Griffith*, 358 S.W.3d 834, 838 (Tex. App.—Tyler 2012, pet. denied) (observing that a fraction-of-royalty NPRI conveys "a fractional share of the royalty that is contained in an oil and gas lease—it is not fixed, but rather floats in accordance with the size of the landowner's royalty contained in the

---

[9] Under this formulation, if the possibility of reverter is a component of the minerals, then Burlington arguably has a current leasehold on it.

lease"). As a derivative of a floating royalty interest, we believe that the possibility of reverter in the NPRI became subsumed under the royalty interest that the Koopmanns reserved for themselves under their lease with Burlington.[10] *Id.*

Second, to classify the possibility of reverter as a mineral interest teeters on the absurd in the context of a lessor/lessee relationship. The reality is that the Koopmanns leased their minerals to Burlington with the expectation that Burlington would pay them a percentage of royalties on oil and gas production from those minerals. In order to accept Strieber, Burlington, and ConocoPhillips' argument, we would have to conclude that the Koopmanns somehow intended to convey their reversionary right to receive royalties to the very entity from whom they expected to receive royalties—i.e., Burlington. This calls into question the consideration supporting the lease in the first place. *See Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005) ("An oil and gas lease is a contract, and its terms are interpreted as such."); *see also Burges v. Mosley*, 304 S.W.3d 623, 629 (Tex. App.—Tyler 2010, no pet.) ("For a contract to exist, there must be an offer, acceptance,

---

[10] Relying on *Monroe v. Scott,* Strieber, Burlington, and ConocoPhillips assert that the Koopmanns' possibility of reverter is a component of the mineral estate that the Koopmanns conveyed to Burlington under the lease. *See* 707 S.W.2d 132 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.). Under their reading of *Monroe v. Scott*, a possibility of reverter in an NPRI can never be a royalty interest. We do not read *Monroe v. Scott* to support such a broad proposition. In that case, we held that a possibility of reverter in an NPRI did not belong with the "royalty interests" retained by the grantor under a partition deed; instead, we found that the possibility of reverter was a mineral interest that the grantor conveyed by deed to the grantee. *Id.* at 134. Guided by the precept that the intent of the parties as expressed in the language of the deed controls, we found that the grantor's possibility of reverter in the NPRI was not clearly described in the partition deed as a "royalty interest" sufficient to except it from the mineral estate conveyed to the grantee. *Id.* at 133–34. Our holding in *Monroe v. Scott* was limited to the specific language used in the partition deed to determine the intent of the parties with respect to the particular conveyance at issue in that case. We did not hold that *all* reversionary royalty interests are minerals; nor did we hold that such interests would be minerals when, as here, there is a lessor/lessee relationship between the grantor and grantee in the context of an oil and gas lease. Finally, to the extent that *Monroe v. Scott* can be read to suggest that a possibility of reverter in an NPRI is not a royalty interest, we would conclude that the NPRI at issue in this case is distinguishable from the one in *Monroe* because it is a fraction-of-royalty, which, as explained above, floats with the royalty interest that the Koopmanns reserved for themselves under the lease. *See id.*; *see also Coghill v. Griffith*, 358 S.W.3d 834, 838 (Tex. App.—Tyler 2012, pet. denied).

and consideration."). For these reasons, we do not believe that Burlington owns a leasehold on the Koopmanns' possibility of reverter under *Bagby's* two-grant theory.

### c. *Peveto*

Finally, Strieber, Burlington, and ConocoPhillips assert that the Texas Supreme Court's 1982 decision in *Peveto* implicitly overrules *Bagby* and effectively voids the Koopmanns' interest in the NPRI under the rule against perpetuities. We disagree.

In *Peveto*, the grantor deeded an NPRI to the grantee for fifteen years and for as long thereafter as production continues. *Peveto*, 645 S.W.2d at 771. Thirteen years into the initial fifteen-year period, the grantor conveyed the same NPRI to a different grantee using a second deed, which specifically provided that the grant would become "effective only upon" the termination of the first deed. *Id.* The *Peveto* court voided the second grant under the rule against perpetuities because it conveyed a "springing executory interest."[11] The court observed that the NPRI conveyed under the first deed was a "determinable fee" interest because its duration was dependent on oil and gas production, which, according to the court, could continue for an indefinite period of time. *Id.* at 772 (explaining that a determinable fee is "an interest which may continue forever, but the estate is liable to be determined, without the aid of a conveyance, by some act or event circumscribing its continuance or extent"). Turning to the second deed, the court found that the interest conveyed therein violated the rule against perpetuities because the words "effective only upon [termination of the first deed]" made it so that the second grantee's interest might

---

[11] An "executory interest" is "a future interest, held by a third person, that either cuts off another's interest or begins after the natural termination of a preceding estate." BLACK'S LAW DICTIONARY (10th ed. 2014). A "springing executory interest" is a type of executory interest that "operates in defeasance of an interest left in the transferor." *Id.*

never actually "vest" if the existence of production operated to perpetually preserve the NPRI in the first grantee.

Peveto is distinguishable from this case and Bagby. In Peveto, there were two deeds, not one, and the issue was whether the rule against perpetuities voided the second deed when the express language of the deed effectively conditioned the grant of a future interest itself on the occurrence of an event that might never occur—i.e., cessation of oil and gas production. The perpetuities problem in Peveto did not lie in the fact that the second grantee's future interest followed a determinable fee interest, nor did it trouble the Peveto court that the first grantee's interest might continue for an indefinite period of time; instead, the perpetuities problem lied in the fact that the grant of the second grantee's future interest was, itself, expressly conditioned upon the termination of the first grantee's interest, which might continue for an indefinite time. For this reason, the second grantee's future interest suffered from a fatal "vesting" problem under the rule against perpetuities. This understanding of Peveto is reinforced by the fact that the Supreme Court after Peveto in Luckel upheld the grant of a similar future interest when, unlike Peveto, the deed did not expressly condition the effectiveness of the grant itself on the termination of a determinable fee interest. Luckel, 819 S.W.2d at 464 (distinguishing the conveyance in Peveto on the basis that the deed did not expressly condition the effectiveness of the grant itself on the expiration of the preceding interest).

Here, as in Luckel and unlike Peveto, the Koopmanns' future interest in the NPRI is created by a single deed, which does not condition the grant of the future interest itself on the termination of Strieber's determinable fee interest; instead, the deed creates a presently vested future interest in the Koopmanns. The fact that the Koopmanns future

24

interest might not result in a possessory right until some uncertain future date does not run afoul of the rule against perpetuities. *See Hunt*, 157 S.W.2d at 436. What matters is that the Koopmanns right to the NPRI vested in interest when the deed was executed. *Id.*

We conclude that *Peveto* does not overrule *Bagby* or void the NPRI under the rule against perpetuities. We therefore deny Strieber, Burlington, and ConocoPhillips' request that we reverse the trial court's summary judgment and render a judgment that the rule against perpetuities invalidates the NPRI.

### 3. Summary

For the reasons set forth above, we hold that fact issues precluding summary judgment exist concerning ownership of the NPRI because the deed's savings clause is ambiguous. As such, the trial court erred in entering a declaration on summary judgment that the Koopmanns own the NPRI. We further hold that the rule against perpetuities does not apply to invalidate the Koopmanns' interest in the NPRI. Therefore, we sustain Strieber, Burlington, and ConocoPhillips' first issue, reverse the trial court's declaratory judgment, and remand the case to the trial court for further proceedings consistent with this opinion.[12]

---

[12] Based on our disposition of this issue, we need not address the Koopmanns' second cross-issue, in which they seek to recover prejudgment and post-judgment interest on unpaid royalties attributable to the NPRI. The reason is that ownership of the NPRI remains an issue to be determined by the factfinder. Furthermore, we need not address Strieber's appeal from the trial court's order severing her cross-claim against Burlington and ConocoPhillips because we are remanding the case to the trial court for further proceedings on whether the NPRI terminated.

## IV. SUMMARY JUDGMENT DISMISSAL OF THE KOOPMANNS' NON-DECLARATORY CLAIMS AGAINST BURLINGTON AND CONOCOPHILLIPS

By their first cross-issue, the Koopmanns contend that the trial court erred in dismissing their non-declaratory claims against Burlington and ConocoPhillips. As the summary judgment movant, Burlington and ConocoPhillips had the burden to show that no genuine issue of material fact existed as to each of the Koopmanns' non-declaratory claim and that they were therefore entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c). We address the trial court's dismissal of each claim separately.

### 1. Breach of Contract

The Koopmanns sued Burlington for breach of contract claiming that Burlington owes royalties on the NPRI pursuant to the lease agreement. The trial court dismissed this claim on summary judgment. Burlington and ConocoPhillips defend the trial court's summary judgment on the basis that section 91.402 of the natural resources code bars all of the Koopmanns' non-declaratory claims, including breach of contract.[13] *See* TEX. NAT. RES. CODE ANN. § 91.402. Section 91.402 reads as follows:

> (a) [Royalties] must be paid to each [royalty owner] by [the oil-and-gas lessee] on or before 120 days after the end of the month of first sale of production from the well. . . .

> (b) [Royalty payments] may be withheld without interest beyond the time limit [] set out in Subsection (a) of this section when there is . . . *a dispute concerning title that would affect distribution of payments*.

---

[13] As a threshold matter, we observe that the unresolved fact issue concerning ownership of the NPRI discussed above precludes summary judgment as to this claim. The reason is that Burlington would have no obligation to pay royalties on the NPRI under the lease if the savings clause applies to preserve the NPRI in Strieber beyond December 27, 2011. However, we must address Burlington and ConocoPhillips' defense of the trial court's summary judgment under section 91.402 because, if valid, it provides an independent basis to affirm the summary dismissal of the Koopmanns' claim for breach of contract.

26

*Id.* (emphasis added). Focusing on the italicized language in subsection (b), Burlington and ConocoPhillips assert that section 91.402 does not allow royalty owners to bring non-declaratory claims against lessees who withhold royalties because of a "dispute concerning title that would affect distribution of payments." Reasoning from this interpretation of subsection (b), Burlington and ConocoPhillips contend that the trial court properly dismissed the Koopmanns' claim for breach of contract, a non-declaratory claim, on summary judgment because ownership of the NPRI is in dispute. We agree that ownership of the NPRI is in dispute. However, for two reasons, we disagree that section 91.402 bars the Koopmanns' non-declaratory claims because of this dispute.

First, the House Bill analysis on section 91.402 indicates that the statute was designed to protect royalty owners from unjustified payment delays by lessees, while at the same time recognizing that such delays sometimes stem from legitimate title disputes. *See Concord Oil Co. v. Pennzoil Exploration & Prod. Co.*, 966 S.W.2d 451, 461 (Tex. 1998) (citing bill analysis). Consistent with this purpose, the plain language of section 91.402 confers a substantive right on royalty owners by imposing a deadline on lessees to pay out royalties, while extinguishing interest on late payments when lessees withhold royalties because of a title dispute. *See* TEX. NAT. RES. CODE ANN. § 91.402. With that said, no language in subsection (b) can be reasonably understood to bar non-declaratory claims as a procedural vehicle for enforcing section 91.402. See *id.* We will not read into the statute a procedural limitation that is not evident from the statute's plain language. *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 628 (Tex. 2008) (recognizing that courts should not read language into a statute when the legislature did not put it there). Furthermore, the legislature's intent not to impose such a procedural limitation on royalty

owners is reinforced by section 91.404(c)—an accompanying section in the natural resources code. *See* TEX. NAT. RES. CODE ANN § 91.404(c) (West, Westlaw through 2015 R.S.). Section 91.404(c) states that royalty owners have a "cause of action" against lessees who violate section 91.402(a). *Id.* The term "cause of action" is not defined in the statute, and there is no indication that the legislature intended the term to exclude non-declaratory causes of action.[14] *Id.*

Second, Burlington and ConocoPhillips' interpretation of section 91.402(b) is inconsistent with the remedial nature of declaratory judgments in general. It is well settled that a declaratory judgment coexists with other available remedies—it does not replace them. *See MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 670 (Tex. 2009) (observing that a declaratory judgment does not supplant all other remedies); *Crow v. City of Corpus Christi*, 146 Tex. 558, 561, 209 S.W.2d 922, 924 (1948). If we were to accept Burlington and ConocoPhillips' interpretation of section 91.402(b), a declaratory judgment would essentially become the exclusive remedy for a violation of section 91.402(a), which is inconsistent with the nature and purpose of a declaratory judgment. Absent express legislative direction to the contrary, we will not assume that the legislature intended to make declaratory judgments the exclusive remedy for violations of section 91.402.

For these reasons, we conclude that a declaratory suit is not the exclusive procedural vehicle through which royalty owners may recover unpaid royalties from

---

[14] *Compare* TEX. NAT. RES. CODE ANN. § 91.404(c) (providing that royalty owners have a "cause of action" against lessees for section 91.402(a) violations), *with id.* § 33.171(a) (providing that a "littoral owner whose rights may be affected by any action of the [government] under this chapter may bring suit for *a declaratory judgment* against [the government] in a district court in Travis County to try the issues") (emphasis added)).

28

lessees when title to such royalties is in dispute under section 91.402. *See* TEX. NAT. RES. CODE ANN. § 91.402. Therefore, the trial court erred in dismissing the Koopmanns' claim for breach of contract, a non-declaratory claim, on the basis that title to the NPRI was in dispute.

## 2. Unjust Enrichment (and Money Had and Received)

The Koopmanns alleged that ConocoPhillips unjustly enriched itself by retaining royalties on the NPRI. The trial court dismissed this claim on summary judgment.

When, as here, a valid contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory, such as unjust enrichment. *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000) (holding that the plaintiff's claim for unjust enrichment was barred as a matter of law when an express contract covered the subject matter of the parties' dispute). Instead, breach of contract is the appropriate theory of recovery. *Id.* Here, there is no dispute that an express and enforceable lease agreement between the parties governs payment of royalties to the Koopmanns.

The Koopmanns maintain that unjust enrichment is a valid theory of recovery against ConocoPhillips because only Burlington signed the lease agreement. We disagree. The rule barring unjust enrichment not only applies when a plaintiff seeks to recover from the party with whom he expressly contracted but also applies when a plaintiff seeks to recover from a third party to the contract who benefited from its performance. *See Black Lake Pipe Line Co. v. Union Constr. Co.*, 538 S.W.2d 80 (Tex. 1976), *overruled on other grounds*, 767 S.W.2d 686, 690 (Tex. 1985); *Woodard v. Sw. States, Inc.*, 384 S.W.2d 674, 675 (Tex. 1964); *Protocol Techs., Inc. v. J.B. Grand Canyon Dairy, L.P.*, 406

S.W.3d 609, 614 (Tex. App.—Eastland 2013, no pet.); *Pepi Corp. v. Galliford*, 254 S.W.3d 457, 462 (Tex. App.—Houston [1st Dist.] 2007, pet. denied); *San Antonio Masonry & Tool Supply, Inc. v. Epstein & Sons Intern., Inc.*, 281 S.W.3d 441, 446 (Tex. App.—San Antonio 2005), *judgment withdrawn pursuant to settlement*, No. 04-04-00032-CV, 2005 WL 1458065 (Tex. App.—San Antonio June 22, 2005, no pet.); *Hester v. Friedkin Cos., Inc.*, 132 S.W.3d 100, 106 (Tex. App.—Houston [14th Dist.] 2004, pet. denied); *Iron Mountain Bison Ranch, Inc. v. Easley Trailer Mfg., Inc.*, 42 S.W.3d 149, 160 (Tex. App.—Amarillo 2000, no pet.); *W & W Oil Co. v. Capps*, 784 S.W.2d 536, 537 (Tex. App.—Tyler 1990, no writ); *Angroson, Inc. v. Indep. Communications, Inc.*, 711 S.W.2d 268 (Tex. App.—Dallas 1986, writ ref'd n.r.e.); *Morales v. Dalworth Oil Co.*, 698 S.W.2d 772 (Tex. App.—Fort Worth 1985, writ ref'd n.r.e.); *see also Koenig v. Aetna Life Ins. Co.*, No. 4:13-CV-00359, 2015 WL 6473351, at *7 (S.D. Tex. Oct. 27, 2015).

Here, there is no dispute that Burlington is a wholly-owned subsidiary of ConocoPhillips. Given the unity of financial interest recognized between a parent company and its wholly-owned subsidiary, we cannot conclude that ConocoPhillips did not benefit from Burlington's lease to produce and sell oil from the Koopmanns land. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) (observing that "a parent and its wholly owned subsidiary have a complete unity of interest"); *Cleveland Reg'l Med. Ctr., L.P. v. Celtic Props., L.C.*, 323 S.W.3d 322, 346 (Tex. App.—Beaumont 2010, pet. denied) (same). Therefore, the trial court correctly dismissed the Koopmanns' unjust enrichment claim against ConocoPhillips as a matter of law because a valid lease covers the subject matter of this dispute.

### 3. Negligence, Negligence per se, and Conversion

The Koopmanns alleged that Burlington and ConocoPhillips were liable under three tort theories for failing to pay royalties—negligence, negligence per se, and conversion. The trial court dismissed these tort claims based on Burlington and ConocoPhillips' summary judgment argument that the claims are barred by the economic loss rule. On appeal, the Koopmanns argue that the claims fall outside the scope of the economic loss rule, which makes the trial court's dismissal improper.

### (i) Applicable Law

The economic loss rule provides that where the damage sought by the plaintiff in a tort action is only the economic loss to the subject of a contract itself, the remedy ordinarily is one of contract alone, not tort. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998). In other words, when damage allegedly resulting from the defendant's tortious conduct is limited to the loss of a contractual benefit, the economic loss rule applies to bar the action in tort. *See Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) (per curiam); *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991). However, the economic loss rule does not preclude recovery in tort when the defendant, in performing a contract, breaches a legal duty owed to the plaintiff that is independent of the contractual undertaking and that results in damage to the plaintiff above and beyond the mere economic loss of the contractual benefit itself. *See DeLanney*, 809 S.W.2d at 494. To determine whether a particular claim sounds in tort or contract, our focus is on the substance of the claim and not simply on the manner in which it has been pled. *See Clark*

31

*v. PFPP Ltd. P'ship*, 455 S.W.3d 283, 288 (Tex. App.—Dallas 2015, no pet.) (citing *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 617–18 (Tex. 1986)).

To illustrate the economic loss rule, the cases of *DeLanney* and *Scharrenbeck* are instructive. *See DeLanney*, 809 S.W.2d at 494; *Montgomery Ward & Co. v. Scharrenbeck*, 204 S.W.2d 508, 510 (Tex. 1947). In *DeLanney*, the Texas Supreme Court held that the economic loss rule barred the plaintiff's negligence suit against a telephone company for failing to publish the plaintiff's advertisement in the yellow pages as required by their contract. *DeLanney*, 809 S.W.2d at 495. The court found that the telephone company's duty to publish the plaintiff's advertisement arose solely from the contract and that the plaintiff's damages were only for the economic loss caused by the telephone company's failure to perform under the contract. *Id*. Thus, the court held that the telephone company's alleged negligence in failing to publish the advertisement could not be brought as a tort because the plaintiff's injury was only the economic loss to the subject matter of the contract itself. *Id*.

The *DeLanney* court distinguished *Scharrenbeck*—a case in which the court had previously allowed a plaintiff to maintain a negligence suit despite the economic loss rule. *Scharrenbeck*, 204 S.W.2d at 510. In *Scharrenbeck*, the plaintiff sued the defendant for negligence, alleging that the defendant's negligent repair of the plaintiff's water heater burned down the plaintiff's entire home. *Id*. The plaintiff sought recovery for the damage to his home, which had been completely destroyed by the negligently repaired water heater. *Id*. In finding that the economic loss rule did not bar the plaintiff's negligence claim, the court observed that although the contract obligated the defendant to put the plaintiff's water heater back in good working order, tort law also implied a general duty on

32

the defendant to act with reasonable care in making the repairs so as not to injure a person or property by his performance. *Id.* Distinguishing *Scharrenbeck*, the *DeLanney* court observed:

> Accompanying every contract is a common-law duty to perform with care, skill, reasonable expedience and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of the contract. . . . In failing to repair the water heater properly, the defendant [in *Scharrenbeck*] breached its contract. In burning down plaintiff's home, the defendant [in *Scharrenbeck*] breached a common-law duty as well, thereby providing a basis for plaintiff's recovery in tort. . . . If the defendant's conduct—such as negligently burning down a house— would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort. Conversely, if the defendant's conduct—such as failing to publish an advertisement— would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract.

*DeLanney*, 809 S.W.2d at 494.

### (ii) Analysis

In view of the forgoing, we must determine whether the economic loss rule applies to bar the Koopmanns' tort claims when their lease with Burlington governs payment of royalties. Here, the Koopmanns alleged that Burlington and ConocoPhillips were negligent in failing to pay royalties: (1) by not properly managing and administering the lease as a reasonably prudent operator; (2) by not executing the lease with the requisite level of care, skill, reasonable expedience, and faithfulness; and (3) by not cooperating in the performance of the lease.[15] The Koopmanns further alleged that Burlington and ConocoPhillips were negligent per se by failing to timely pay royalties in violation of

---

[15] To support these omissions, the Koopmanns further alleged that Burlington and ConocoPhillips: (a) attempted to conceal that Strieber's NPRI term had expired on December 27, 2011; (b) attempted to maintain Burlington's 60% interest in Strieber's NPRI by tendering a shut-in royalty payment in December 2011 when no such payment was required; (c) failed to properly inspect pertinent documents governing the payment of royalties owed to the Koopmanns; and (d) failed to make the proper royalty payments to the Koopmanns when such payments were due.

section 91.402 of the natural resources code. Finally, the Koopmanns alleged that Burlington and ConocoPhillips committed the tort of conversion by exercising dominion and control over royalties owned by them.[16]

Although artfully pleaded in the language of torts, the substance of the Koopmanns' claims sound in contract. Each tort claim essentially concerns Burlington's—and its parent company's—failure to pay royalties under a valid and enforceable lease agreement. No economic loss other than unpaid royalties is alleged. Unlike the defendant in *Scharrenbeck*, Burlington's and ConocoPhillips' conduct would give rise to liability only because failing to pay royalties breaches the parties' lease agreement, not because there exists some general duty in tort law to pay royalties independent of a contractual duty to do so. Furthermore, unlike the plaintiff in *Scharrenbeck*—who lost not only the contractual benefit of a working water heater but also his entire home—the Koopmanns' loss is limited to the contractual benefit of the lease itself—i.e., royalties.[17] *See Exxon Mobil Corp. v. Kinder Morgan Operating L.P. "A"*, 192 S.W.3d 120, 127–29 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (barring tort claim where the rights of the parties in regard to propane gas were governed by the contract between them, and the only loss that the plaintiff complained about was loss of propane); *Castle Texas Prod. Ltd. P'ship v. Long Trusts*, 134 S.W.3d 267, 275 (Tex.

---

[16] *See Bandy v. First State Bank, Overton*, 835 S.W.2d 609, 622 (Tex. 1992) (defining conversion as the wrongful exercise of dominion and control over another's property that is inconsistent with the property owner's rights).

[17] In their reply brief, the Koopmanns argue that their conversion claim not only seeks recovery of unpaid royalties due under the lease but also seeks recovery for the "wrongful" acts of Burlington and ConocoPhillips. The Koopmanns do not specify what acts were wrongful and, more importantly, do not explain how those acts caused losses separate and apart from the economic loss of royalties due under their lease. Looking at the substance of their conversion claim, the Koopmanns cannot avoid application of the economic loss rule when the alleged wrongdoing, if any and at best, amounts only to a breach of contract. *See Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991).

App.—Tyler 2003, pet. denied) (rejecting conversion claim where the only loss alleged was the economic loss to the subject matter of the contract); *Harrison v. Bass Enterprises Prod. Co.,* 888 S.W.2d 532, 536 (Tex. App.—Corpus Christi 1994, no writ) (rejecting negligence and negligence per se claims because the plaintiff's only damage was unpaid royalties under a contract); *see also Dhanani v. Giles*, No. 10-07-00144-CV, 2008 WL 2210004, at *4 (Tex. App.—Waco May 28, 2008, pet. denied) (mem. op.) (rejecting conversion claim where the defendant's dominion and control over the plaintiff's property was tantamount to a breach of the governing contract). Therefore, we conclude that the trial court properly dismissed the Koopmanns' claims against Burlington and ConocoPhillips for negligence, negligence per se, and conversion under the economic loss rule.

### 4. Summary

For the reasons set forth above, we sustain the Koopmanns' first cross-issue to the extent that it contends that the trial court erred in dismissing the Koopmanns' claim for breach of contract. However, we overrule the Koopmanns' first cross-issue to the extent that it contends that the trial court erred in dismissing the Koopmanns' claims for unjust enrichment, money had and received, negligence, negligence per se, and conversion.

### V. ATTORNEY'S FEES

As previously mentioned, Burlington and ConocoPhillips moved for an early dismissal of all of the Koopmanns' claims under Texas Rule of Civil Procedure 91a. The trial court denied the motion to dismiss and awarded attorney's fees to the Koopmanns on the motion but then later granted summary judgment dismissing the Koopmanns'

claims. By a second issue, Burlington and ConocoPhillips request that we vacate the trial court's order awarding attorney's fees to the Koopmanns because the claims lack a basis in law and fact under Rule 91a and, as such, should have been dismissed by the trial court before the summary judgment stage.

## A. Standard of Review and Applicable Law

We review de novo a trial court's ruling on a motion to dismiss under Rule 91a. *See Wooley v. Schaffer*, 447 S.W.3d 71, 73–77 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *DeVoll v. Demonbreun*, No. 04-14-00116-CV,___S.W.3d___,2014 WL 7440314, at *2 (Tex. App.—San Antonio Dec. 31, 2014, no pet.). Rule 91a.1 provides that "a party may move to dismiss a cause of action on the grounds that it has no basis in law or fact." TEX. R. CIV. P. 91a.1. A cause of action has no basis in law "if the allegations, taken as true, together with inferences reasonably drawn from them, do not entitle the claimant to the relief sought." *Id*. A cause of action has no basis in fact "if no reasonable person could believe the facts pleaded." *Id*. The trial court "may not consider evidence in ruling on the motion and must decide the motion based solely on the pleading of the cause of action, together with any pleading exhibits [.]" *Id*. R. 91a.6. We construe the pleadings liberally in favor of the nonmovant. *See City of Dallas v. Sanchez*, 449 S.W.3d 645, 650 (Tex. App.—Dallas 2014, no pet.).

Rule 91a.7 contains a loser-pays provision concerning attorney's fees. *See* TEX. R. CIV. P. 91a.7. It provides that the trial court must award to the "prevailing party" all reasonable and necessary attorney's fees incurred with respect to the cause of action challenged under Rule 91a. *Id*.

36

## B. Analysis

The record reflects that Burlington and ConocoPhillips sought early dismissal of the Koopmanns' claims under Rule 91a based on the following two main grounds: (1) section 91.402(b) of the natural resources code bars all of the claims; and (2) the economic loss rule bars only the negligence claims.

With respect to the first ground, we determined in Part IV(1) of this opinion that section 91.402(b) of the natural resources code does not bar a claim for breach of contract—or any other non-declaratory claim for that matter—brought by a royalty owner to recover unpaid royalties. Thus, to the extent that Burlington and ConocoPhillips' Rule 91a motion sought to dismiss all of the Koopmanns' claims under section 91.402(b), the trial court properly denied the motion.

However, with respect to the second ground, we determined in Part IV(3)(ii) of this opinion that the economic loss rule bars the Koopmanns' negligence claims as a matter of law; therefore, the trial court properly granted summary judgment dismissing those claims. Given the trial court's summary judgment, the question is whether Burlington and ConocoPhillips should be considered the "prevailing party" entitled to recover attorney's fees under Rule 91a.7. We believe that Burlington and ConocoPhillips have failed to meet their appellate burden to demonstrate that they are entitled to prevailing-party status in this situation. First, they provide no argument or authority that, after liberally construing the Koopmanns' pleadings, the economic loss rule renders the negligence claims legally or factually baseless under Rule 91a.1. See *Wooley*, 447 S.W.3d at 73–77 (providing that courts are to liberally construe the pleadings in favor of the nonmovant on a Rule 91a motion). Second, even assuming that the negligence claims are baseless and should

have been dismissed on the pleadings, Burlington and ConocoPhillips provide no argument or authority that a dismissal of those claims would entitle them to prevailing-party status under Rule 91a.7 when, under that formulation, the Koopmanns are still the "prevailing party" with respect to the majority of the claims, including: (1) breach of contract; (2) unjust enrichment/money had and received; and (3) conversion. *See* Timothy Patton, *Motions to Dismiss Under Texas Rule 91a: Practice, Procedure and Review*, 33 REV. LITIG. 469, 567–68 (2014) (recognizing that Texas courts have struggled to identify who, precisely, "prevailed" in a particular lawsuit under a "loser-pays" provision, such as Rule 91a.7, when the lawsuit involves multiple claims and the movant arguably prevails in dismissing some but not all of the claims on the pleadings); *see also* TEX. R. CIV. P. 91a.7.

For the reasons set forth above, we conclude that the trial court properly denied Burlington and ConocoPhillips' motion to dismiss. Because the Koopmanns successfully defeated the motion to dismiss, the trial court correctly found that they were entitled to recover attorney's fees under Rule 91a.7. *See* TEX. R. CIV. P. 91a.7. We therefore overrule Burlington and ConocoPhillips' second issue.

## VI. CONCLUSION

Accordingly, we affirm the trial court's final judgment, in part, as follows: (1) the trial court's dismissal of the Koopmanns' claims for unjust enrichment, money had and received, negligence, negligence per se, and conversion; and (2) the trial court's award of attorney's fees to the Koopmanns pursuant to Texas Rule of Civil Procedure 91a.7. Further, we reverse, in part, the trial court's final judgment as follows: (1) the trial court's dismissal of the Koopmanns' claim for breach of contract; and (2) the trial court's

38

declaratory judgment.  We remand for further proceedings consistent with Parts III and IV of this opinion.

**/s/ Rogelio Valdez**
ROGELIO VALDEZ
Chief Justice

Delivered and filed this the
19th day of May, 2016.