# IN THE SUPREME COURT OF TEXAS

═══════════

No. 16-0662

═══════════

CONOCOPHILLIPS COMPANY AND
BURLINGTON RESOURCES OIL & GAS CO., L.P., PETITIONERS,

v.

RALPH WADE KOOPMANN, KAREN MARIE KOENIG, LORENE H. KOOPMANN,
AND LOIS STRIEBER, INDIVIDUALLY AND AS EXECUTRIX OF
THE ESTATE OF JERRY STRIEBER, RESPONDENTS

═══════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS

═══════════════════════════════

**Argued December 5, 2017**

JUSTICE GREEN delivered the opinion of the Court.

JUSTICE BLACKLOCK did not participate in the decision.

In this case, we must determine whether the common law rule against perpetuities invalidates a grantee's future interest in the grantor's reserved non-participating royalty interest. We hold that it does not, but on grounds different from those expressed by the court of appeals. However, we hold that the reservation's savings clause is ambiguous and affirm the court of appeals' remand on this issue. In addition, we hold that section 91.402 of the Texas Natural Resources Code does not preclude a lessor's common law claim for breach of contract. Finally, we affirm the court of appeals' judgment as to attorney's fees pursuant to Texas Rule of Civil Procedure 91a.

## I. Background

In 1996, Lois Strieber conveyed, by warranty deed, fee simple title to a 120-acre tract of land in Dewitt County to Lorene Koopmann and her late husband. The deed included the following language:

> RESERVATIONS FROM AND EXCEPTIONS TO CONVEYANCE AND WARRANTY:
> 1. There is EXCEPTED from this conveyance and RESERVED to the Grantor and her heirs and assigns for the term hereinafter set forth one-half (½) of the royalties from the production of oil, gas . . . and all other minerals . . . which reserved royalty interest is a non-participating interest and is reserved for the limited term of 15 years from the date of this Deed and as long thereafter as there is production in paying or commercial quantities of oil, gas, or said other minerals from said land or lands pooled therewith. If at the expiration of 15 years from the date of this Deed, oil, gas, or said other minerals are not being produced or mined from said land . . . this reserved royalty interest shall be null and void and the Grantor's rights in such reserved royalty shall terminate. It is expressly understood, however, that if any oil, gas, or mineral or mining lease covering said land . . . is maintained in force and effect by payment of shut-in royalties or any other similar payments made to the lessors or royalty holder in lieu of actual production while there is located on the lease or land pooled therewith a well or mine capable of producing oil, gas, or other minerals in paying or commercial quantities but shut-in for lack of market or any other reason, then . . . it will be considered that production in paying or commercial quantities is being obtained from the land herein conveyed.

Thus, Strieber reserved a fifteen-year, one-half non-participating royalty interest (the NPRI), which could be extended "as long thereafter as there is production in paying or commercial quantities" under an oil and gas lease. The deed was dated December 27, 1996. Lorene Koopmann later executed a gift mineral deed conveying an undivided two-thirds of her mineral interest to her two children (together, the Koopmanns).

In 2007, Lorene Koopmann entered a three-year lease of the tract with Hawke Enterprises. The lease provided for a three-year primary term ending October 2010, and it gave Hawke the option

to extend the primary term an additional two years in exchange for a $24,000 payment. Hawke later assigned the lease to Burlington Resources Oil & Gas Company, L.P.[1] No production had occurred in 2009, and that year Burlington tendered the $24,000 payment to the Koopmanns to extend the lease's primary term until October 22, 2012. This tract was pooled with other leases over 600 acres known as "Lackey Unit A." In December 2010, Burlington and the Koopmanns executed an amended lease, which brought the Koopmann children's interests under the Burlington lease along with other amendments. Strieber ratified this amended lease.

As of August 2011, there still had been no production from the Koopmanns' land and only four months remained on the initial fifteen-year period of Strieber's reserved NPRI. Strieber conveyed to Burlington a 60% interest in her NPRI, presumably as an incentive to motivate Burlington to begin drilling.

Thereafter, Burlington identified a well site on Lackey Unit A, and on December 7, 2011, Burlington sent a letter to the Koopmanns informing them that a well was anticipated to begin producing oil and gas in the first quarter of 2012. The letter noted that the reservation's savings clause in Strieber's deed required payment of shut-in royalties in order to maintain the NPRI interests, and Burlington included "shut-in royalty payments," explaining that these payments were made "to ensure that all parties' interest, if any, in the well is maintained."

The parties do not dispute that there was no well actually producing on December 27, 2011, but the parties offered conflicting summary judgment evidence as to whether there was a well

---

[1] Burlington is a subsidiary of ConocoPhillips Company, the other petitioner in this case. We refer to the two together as "Burlington."

3

*capable* of producing in paying or commercial quantities as of that date. Actual production was not accomplished on Lackey Unit A until February 2012, about two months after the end of the NPRI's initial fifteen-year term. On February 6, Burlington notified the Koopmanns that because there was a dispute over the royalty interests in Lackey Unit A, Burlington would be "suspending payments to anyone" until the matter was resolved. A few days later, the Koopmanns returned the "shut-in royalty payments" they had received from Burlington.

The Koopmanns sought declaratory judgment against Burlington and Strieber to construe the deed, claiming that they were the sole owners of the NPRI as of December 27, 2011. They also asserted non-declaratory claims against Burlington for breach of contract, unjust enrichment (money had and received), conversion, negligence, and negligence per se.[2]

Burlington filed a motion to dismiss the non-declaratory claims under Texas Rule of Civil Procedure 91a, asserting that the Koopmanns' claims were barred by section 91.402(b) of the Texas Natural Resources Code, which provides lessees the right to suspend royalty payments when there is a title dispute. *See generally* TEX. R. CIV. P. 91a; TEX. NAT. RES. CODE § 91.402(b). In the same motion, Burlington argued that the Koopmanns' negligence and negligence per se claims were barred by the common law economic-loss rule. The trial court denied this motion and awarded attorney's fees to the Koopmanns under the loser-pays provision of Rule 91a. *See generally* TEX. R. CIV. P. 91a.7 (providing that a court must award the "prevailing party" on the motion to dismiss

---

[2] The claims against Burlington were for breach of contract, unjust enrichment (money had and received), conversion, negligence, and negligence per se. The claims against ConocoPhillips were for conversion, tortious interference with contract, negligence, negligence per se, and imputed gross negligence and malice.

all costs and reasonable and necessary attorney's fees).  Burlington later filed a motion for summary judgment on the same claims asserting similar arguments.  The trial court granted summary judgment and ordered that the Koopmanns take nothing as to those claims.

As to the declaratory action, the parties filed competing motions for summary judgment.  The trial court granted the Koopmanns' motion, concluding: (1) on December 27, 2011, there was no well that was actually producing in paying or commercial quantities on Lackey Unit A; (2) accordingly, Burlington's and Strieber's NPRI expired at that time; and (3) the Koopmanns, as sole owners of the royalty interest, were due royalty payments under their lease with Burlington.

Both parties appealed.  Burlington appealed the declaratory judgment, claiming that Strieber's reservation created a future interest in the Koopmanns that was void under the rule against perpetuities (the Rule) and that Burlington's interest was independently maintained because its activities satisfied the deed's savings clause.  Burlington also asserted that the trial court's award of attorney's fees to the Koopmanns under Rule 91a was improper.  The Koopmanns appealed the trial court's summary judgment on all of its non-declaratory claims, arguing that section 91.402(b) of the Natural Resources Code does not bar those claims.

The court of appeals affirmed in part, reversed in part, and remanded for further proceedings. ___ S.W.3d ___, ___ (Tex. App.—Corpus Christi 2016, pet. granted) (mem. op.).  By applying the "two-grant theory" developed in *Bagby v. Bredthauer*, 627 S.W.2d 190 (Tex. Civ. App.—Austin 1981, no writ), the court concluded that the Rule did not bar the Koopmanns' future interest in the NPRI.  *Id*. at ___.  The court found that the reservation's savings clause was ambiguous, however, and remanded the case for a jury to determine the proper interpretation.  *Id*. at ___.  With regard to

the non-declaratory claims, the court of appeals upheld the trial court's summary judgment dismissing the Koopmanns' claims for negligence, negligence per se, conversion, unjust enrichment, and money had and received under the economic-loss rule. *Id.* at ___. However, it held that section 91.402 of the Natural Resources Code does not bar a claim for breach of contract, and it reversed on that issue. *Id.* at ___. Finally, although the court of appeals determined that several of the Koopmanns' claims failed as a matter of law, the court of appeals upheld the trial court's award of attorney's fees against Burlington under Texas Rule of Civil Procedure 91a.7. *Id.* at ___.

Burlington asserts four points on appeal to this Court: (1) the court of appeals erred in applying the two-grant theory and holding that the Koopmanns' future interest in the NPRI was not violated; (2) even if the Rule did not bar the Koopmanns' claims, the savings clause is not ambiguous and Burlington's activities maintained its interest in the NPRI after the initial fifteen-year period; (3) the court of appeals erred in reinstating the Koopmanns' breach-of-contract claim; and (4) the court of appeals misapplied Texas Rule of Civil Procedure 91a's loser-pays provision. We address each issue in turn.

## II. Analysis

We review the trial court's summary judgment de novo. *Provident Life & Accidental Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Id.*; *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). Under Texas Rule of Civil Procedure 166a(c), the party moving for summary judgment bears the burden to show that no genuine issue of material fact exists and that it is entitled to judgment as

6

a matter of law. TEX. R . CIV. P. 166a(c); *Provident Life & Accidental Ins. Co.*, 128 S.W.3d at

215–16. On cross motions for summary judgment, each party bears the burden of establishing that

it is entitled to judgment as a matter of law. *City of Garland v. Dall. Morning News*, 22 S.W.3d 351,

356 (Tex. 2000). When the trial court grants one motion and denies the other, the reviewing court

should determine all questions presented and render the judgment that the trial court should have

rendered. *Id.*

To grant summary judgment declaring that the Koopmanns own the NPRI, the trial court had

to find both that: (1) the Rule did not apply to invalidate the Koopmanns' interest in the NPRI, and

(2) the reservation's savings clause did not apply to preserve Strieber's interest in the NPRI. The

court of appeals agreed with the trial court's first finding, but it held that the savings clause was

ambiguous and reversed and remanded for a jury to determine the proper interpretation. For the

reasons stated below, we agree.

### A. Strieber's Reservation and the Rule Against Perpetuities

As explained above, Strieber's deed conveyed to the Koopmanns fee-simple title to the tract,

and reserved a fifteen-year, one-half NPRI, which could be extended "as long thereafter as there is

production in paying or commercial quantities" under an oil and gas lease. In the event there was

no production after the fifteen-year term, the reservation included a savings clause. Thus, if on

December 27, 2011, there was no production in paying quantities and the savings clause was not

satisfied, the NPRI would transfer to the Koopmanns.

Burlington asserts that the Koopmanns' future interest in the NPRI violates the Rule and is

therefore void. According to Burlington, the "as long thereafter" language Strieber used in her

7

reservation created in the Koopmanns a springing executory interest, which is not certain to vest, if at all, within the period required by the Rule: twenty-one years after the death of some life or lives in being at the time of the conveyance. *See BP Am. Prod. Co. v. Laddex, Ltd.*, 513 S.W.3d 476, 479 (Tex. 2017). Burlington argues that our decision in *Peveto v. Starkey*, 645 S.W.2d 770 (Tex. 1982), in which we held that a royalty conveyance violated the Rule because it was not certain to become effective within the required time period, is controlling in this case. Burlington would have us "apply the Rule" by excising the Koopmanns' future interest from the deed and leave "all remaining interests intact." Strieber, who filed a brief in this Court as a respondent, asserts the same.[3]

The Koopmanns characterize their future interest created by Strieber's deed as a "vested possibility of reverter," which vested at its creation for purposes of the Rule, and thus, is valid. There is a decided difference, according to the Koopmanns, between vesting in interest and vesting in possession, and if two constructions are possible, Texas courts favor the construction that saves the validity of an instrument. *See Laddex*, 513 S.W.3d at 480. They argue that *Peveto* is factually distinguishable and actually supports characterizing this interest as a possibility of reverter. Additionally, the Koopmanns argue that the two-grant theory employed by the court of appeals is not necessary for them to win because, here, Strieber "carved out" a new fee simple determinable by her reservation, creating a then-vested future interest in the Koopmanns not subject to the Rule.

---

[3] Somewhat confusingly, Strieber asks us to "reform the deed and find that the Strieber NPRI was void at its inception." She goes on to argue that there is "no expiration date contingent on continued production associated with the term of the NPRI, and there is no need to apply the savings clause." We presume, based on the latter excerpt, that Strieber asserts, as does Burlington, that the Koopmanns' future interest *as created by* the Strieber reservation was void at its inception; otherwise, Strieber's first statement would appear to be asking us to hold that she never reserved any interest in the NPRI.

The Koopmanns contend that while the two-grant theory need not apply in this case, it would create a just result by carrying out the parties' intentions. The Koopmanns warn that if we recognize a Rule violation in this case, we would call into question every oil and gas lease that uses similar language, which would be disastrous for the oil and gas industry. Finally, the Koopmanns note that the public policy underlying the Rule—preventing the long-term isolation of property from commerce and development and the creation of bloodline dynasties over property—is not implicated here.

The Texas Constitution prohibits perpetuities: "Perpetuities . . . are contrary to the genius of free government, and shall never be allowed." TEX. CONST. art. I § 26. The constitution does not define "perpetuities." The interpretative commentary states both that "perpetuity" as applied to property means an "everlasting property interest[]" and that "[f]or purposes of this section, a perpetuity is a restraint or restriction of the power of alienation beyond [the period required by the Rule], and as such would not be constitutionally allowed." TEX. CONST. art. I § 26, interp. commentary (Vernon 2007); *see also Perpetuity*, Black's Law Dictionary (10th ed. 2014) (including among the term's multiple definitions both "[a]n inalienable interest" and "[a]n interest that does not take effect or vest within the period prescribed by law"). To enforce this prohibition, we have adopted the common law version of the Rule to govern conveyances of real property, which provides that "no interest is valid unless it must vest, if at all, within twenty-one years after the death of some life or lives in being at the time of the conveyance."[4] *Laddex*, 513 S.W.3d at 479; *see also* TEX.

---

[4] Section 112.036 of Texas's Property Code provides that the common law version of the Rule applies to non-charitable trusts. *See* TEX. PROP. CODE § 112.036. The Legislature has not enacted laws requiring that future interests arising from conveyances of real property vest at a certain time, however, and thus that

9

CONST. art. I § 26, interp. commentary (Vernon 2007). The Rule requires that a challenged conveyance be viewed as of the date the instrument is executed, and the interest is void if by any possible contingency the grant or devise could violate the Rule. *Peveto*, 645 S.W.2d at 772. When an instrument is equally open to two constructions, the construction that renders it valid rather than void will be accepted, assuming that the grantor intended to create a legal instrument. *Laddex*, 513 S.W.3d at 480; *Kelly v. Womack*, 268 S.W.2d 903, 906 (Tex. 1954). We have held that the typical oil and gas lease in Texas, which grants a lessee the right to explore and develop for a fixed term of years and as long thereafter as minerals are produced, creates in the lessee a fee simple determinable in the mineral estate that does not violate the Rule. *See Rosson v. Bennett*, 294 S.W. 660, 662 (Tex. 1927).

The word "vest" in regards to the Rule refers to an immediate, fixed right of present or future enjoyment of the interest. *Vest*, BLACK'S LAW DICTIONARY (10th ed. 2014); *see also Peveto*, 645 S.W.2d at 772. The Rule does not apply to present or future interests that vest at their creation. *Laddex*, 513 S.W.3d at 480. An executory interest is a future interest, held by a third person, that either cuts off another's interest or begins after the natural termination of a preceding estate. *Executory Interest*, BLACK'S LAW DICTIONARY (10th ed. 2014). A springing executory interest is one that operates to end an interest left in the transferor. *Springing Executory Interest*, BLACK'S LAW DICTIONARY (10th ed. 2014); *accord Peveto*, 645 S.W.2d at 772. This interest does not vest at the execution of the deed, rather "executory interests vest an estate in the holder of the interest upon the happening of a condition or event." 3 RICHARD R. POWELL, POWELL ON REAL PROPERTY

determination has remained with this Court.

10

§ 20.05[2] (Michael Allan Wolf ed.). "Until such happening, they are non-vested future interests" and are subject to the Rule. *Id.* In contrast, a possibility of reverter is a future interest held by the grantor and is not subject to the Rule because it vests at the moment of creation. *El Dorado Land Co., L.P. v. City of McKinney*, 395 S.W.3d 798, 802–03 (Tex. 2013); *see Luckel v. White*, 819 S.W.2d 459, 464 (Tex. 1991). A possibility of reverter is "the grantor's right to fee ownership in the real property reverting to him if the condition terminating the determinable fee occurs." *Luckel*, 819 S.W.2d at 464. This interest is properly viewed as a "claim[] to property that the grantor never gave away." *El Dorado Land Co., L.P.*, 395 S.W.3d at 802–03 (citing 3 POWELL ON REAL PROPERTY § 20.02[1]).

Under the common law Rule, with respect to the NPRI, the deed created in Strieber a fee simple subject to executory limitation and in the Koopmanns an executory interest. The Koopmanns received a future interest created in someone other than the grantor that would become possessory by the divesting of Strieber's prior freehold estate, i.e., an executory interest. *See Peveto*, 645 S.W.2d at 772; 3 POWELL ON REAL PROPERTY § 20.05[2]. Strieber's present interest would continue "as long thereafter as" there is production of minerals in paying or commercial quantities—an indeterminable length of time. Thus, at the time it was created, it was uncertain whether the Koopmanns' future interest would vest within the period required by the Rule. The Koopmanns' argument that their future right to the NPRI "vested in interest" immediately upon execution of the deed is simply not the law: springing executory interests do not vest, by definition, until the condition terminating the grantor's present possessory interest is met. 3 POWELL ON REAL PROPERTY § 20.05[2]. Thus, because at the time of the grant the executory limitation on Strieber's

11

interest—lack of production in paying quantities—might not happen within twenty-one years after the death of some life or lives in being, the Koopmanns' springing executory interest violated the Rule. *See Peveto*, 645 S.W.2d at 772. Notably, if the conveyance had been a grant of the NPRI rather than a reservation, i.e., if Strieber had first conveyed all she owned to the Koopmanns and then the Koopmanns had conveyed back to Strieber a one-half NPRI for fifteen years and as long thereafter as there was mineral production, the Koopmanns' future interest would be classified as a vested possibility of reverter and within the requirements of the Rule. *See id.*; *Luckel*, 819 S.W.2d at 464.[5]

When an interest violates the Rule because it is uncertain to vest, if at all, within the required time period, we have traditionally held that those provisions of the conveying instrument creating the interest are void. *E.g.*, *Peveto*, 645 S.W.2d at 772; *Kettler v. Atkinson*, 383 S.W.2d 557, 561 (Tex. 1964) (holding that provisions of a will creating a perpetual noncharitable trust for testator's heirs were void). We have stated that our constitutional provision prohibiting perpetuities "expresses one of the cardinal and basic principles of our system of government" and must be "relentlessly enforced." *Brooker v. Brooker*, 106 S.W.2d 247, 254 (Tex. 1937). But we hesitate to apply the Rule to invalidate this future interest when, as the Koopmanns point out, such a holding would not serve the purpose of the Rule. This Court strictly adheres to the rule of construction that

---

[5] *See also* 28 Am. Jur. 2d Estates § 35 (2011) ("While a fee simple determinable is created by the grant of the fee simple determinable to the grantee, thereby reserving the possibility of reverter to the grantor, where an attempt is made to reverse the positions of the grantor and grantee by excepting a determinable fee from the grant, the grantor is held to take a determinable fee, but the grantee takes a future interest in the nature of a springing use, rather than a possibility of reverter, which future interest may, unlike a possibility of reverter, be subject to the rule against perpetuities.").

an instrument equally open to two constructions should be construed as valid rather than void, *see, e.g.*, *Laddex*, 513 S.W.3d at 480, and the Legislature has required courts to reform an interest that violates the Rule "to effect the ascertainable general intent of the creator of the interest." TEX. PROP. CODE § 5.043(a). *See generally* 10 POWELL ON REAL PROPERTY § 71.03 (noting that "dissatisfaction with the harshness of [the Rule's] application has resulted in significant statutory modifications of the rule against perpetuities in the second half of the twentieth century"). In addition, we have declined to hold that an interest is void when it does not violate the purpose of the Rule. *See Cherokee Water Co. v. Forderhause*, 641 S.W.2d 522, 526 (Tex. 1982) (agreeing with the court of appeals, which held that a preferential right to purchase that was unlimited as to time was not prohibited by the Rule because it did not constitute an unreasonable restraint on alienation).

We have recognized the purpose of the Rule as preventing landowners from using remote contingencies to preclude alienability of land for generations. *Kettler*, 383 S.W.2d at 560 ("The purpose of the rule is to prevent the taking of the subject matter of the perpetuity out of commerce or trade for the prohibited period."); *see also* TEX. CONST. art. I § 26, interp. commentary (Vernon 2007) (explaining that the Rule developed because "it was believed to be a public evil to permit the fettering of the marketability over long periods of time by indirect restraints on its alienation"); *Weber v. Tex. Co.*, 83 F.2d 807, 808 (5th Cir. 1936) ("The underlying reason for and purpose of the rule is to avoid fettering real property with future interests dependent upon contingencies unduly remote which isolate the property and exclude it from commerce and development for long periods of time, thus working an indirect restraint upon alienation, which is regarded at common law as a public evil."); 34 TEX. JUR. 3d Estates § 55 (2018) ("The purpose of the rule against perpetuities is

13

to prevent the taking of the subject matter of the perpetuity out of commerce or trade for the prohibited period."). But restraint on alienability and promoting the productivity of land is not at issue in the oil and gas context. *See* 2 WILLIAMS & MEYERS, OIL AND GAS LAW § 335 (2017). In their treatise, Williams & Meyers proffer the following rationale for creating an exception in this context:

> We believe that defeasible term interests serve a useful social purpose, whether reserved or granted. The term interest, as compared with a perpetual interest, tends to remove title complications when the land is no longer productive of oil or gas. This simplification of title promotes alienability of land, which is one purpose served by the Rule [A]gainst Perpetuities. We believe, therefore, that the courts should simply exempt interests following granted or reserved defeasible term interests from the Rule, on the straight-forward basis that they serve social and commercial convenience and do not offend the policy of the Rule Against Perpetuities.

*Id.* Considering the purpose of the Rule, if the Koopmanns' future interest in the NPRI could be considered "vested" at the time it was created for purposes of transferability and inheritability, then it would be appropriate for this Court to refrain from applying the Rule to invalidate their interest. *See* 1 EUGENE KUNTZ, A TREATISE ON THE LAW OF OIL AND GAS § 17.3 (Matthew Bender, rev. ed.) ("The application of the rule against perpetuities to the interest following a retained term mineral interest is easily overlooked, probably because the evil designed to be avoided by the rule is not readily apparent if it is present at all."). This would be consistent with the purpose of the Rule as we have stated it because alienability and productivity of reserved mineral interests would be facilitated, not hindered. *See* Laura H. Burney, *A Pragmatic Approach to Decision Making in the Next Era of Oil and Gas Jurisprudence*, 16 J. ENERGY, NAT. RESOURCES, & ENVTL. L. 1, 45 (1996)

("Only the straightforward exemption for most oil and gas interests . . . would guarantee title certainty.").

At the time it was created, the Koopmanns' interest in the NPRI shared many characteristics with a vested remainder, a future interest not subject to the Rule. *See* 10 POWELL ON REAL PROPERTY § 73.02[2]. Historically, future interests created in someone other than the grantor were classified as either "remainders" or "executory interests." *E.g.*, *Nat'l Audubon Soc., Inc. v. Marshall*, 424 F.2d 717, 720 (5th Cir. 1970); 3 POWELL ON REAL PROPERTY §20.04[1][a]. A remainder is a future interest created in the transferee that is capable of becoming a possessory estate upon the natural termination of a prior estate created by the same instrument. *Wells v. Houston*, 57 S.W. 584, 598 (Tex. Civ. App.—San Antonio 1900, no writ); 1 LEWIS M. SIMES & ALLAN F. SMITH, THE LAW OF FUTURE INTERESTS, § 103 (2d ed. 1956). Historically, a remainder could not follow a fee simple estate—whether absolute or defeasible—because fee simple estates were thought to have no natural termination point and could potentially endure forever. *See Wells*, 57 S.W. at 598 ("No remainder can be limited after a fee simple."); 1 THE LAW OF FUTURE INTERESTS § 103. An executory interest is any future interest created in a grantee other than a remainder that cuts short or divests another estate or interest in order to become possessory. *See Cooley v. Williams*, 31 S.W.3d 810, 813 (Tex. App.—Houston [1st Dist.] 2000, no pet.); 3 POWELL ON REAL PROPERTY § 20.05. As noted above, an executory interest, in contrast to a vested remainder, does not vest so long as it remains a future interest, and is thus subject to the Rule. 1 THE LAW OF FUTURE INTERESTS § 221.

15

The distinction between remainders and executory interests is largely historical, *see* 3 POWELL ON REAL PROPERTY § 20.04[1][a], and some have advocated for abandoning the distinction altogether. *See, e.g.*, Jesse Dukeminier, *Contingent Remainders and Executory Interests: A Requiem for the Distinction*, 43 MINN. L. REV. 13, 14 (1958). The latest version of the Restatement dispenses with the historical parsing of future interests, recognizing only reversions and remainders. *See* RESTATEMENT (THIRD) OF PROPERTY § 25.2 cmt. e (Am. Law Inst. 2011) (noting that the principal legal consequences that historically turned on the distinction have widely been abolished); *cf. El Dorado Land Co., L.P.*, 395 S.W.3d at 803 (refusing to distinguish between a possibility of reverter and right of reentry, both types of reversionary future interests); TEX. PROP. CODE § 5.042(a) (abolishing the common law rule in Shelley's case). More specifically, some commentators take the position that executory interests that share many of the same characteristics as vested remainders should be considered "vested" within the meaning of the Rule. *See, e.g.*, Dukeminier, *supra*, at 16 ("The interest [] should logically be classified as a remainder if the ordinary definition of a remainder be accepted. And in the usual case it should be a vested remainder. It is ready to take whenever and however the preceding estate ends."). In their treatise, Simes and Smith note:

> It should be pointed out that an executory interest limited on an event certain to happen is likely a much more substantial interest than one which depends upon an uncertain event. Thus . . . an executory interest which is certain to vest in enjoyment at the death of a designated person is closely linked with a vested remainder. It may well be, therefore, that they should have the same legal characteristics as their related (but differently named) interests. Rules which are adopted relative to the rather tenuous interests which depend upon uncertain contingencies may be poorly conceived when applied to an interest which bears the same name but is in fact of greater substance.

16

1 THE LAW OF FUTURE INTERESTS § 223.  Powell reaches a similar conclusion:

> Executory interests can either operate in defeasance of a prior vested fee or can be limited to take effect on a future event uncertain of occurrence.  Both types of executory interest violate the common-law rule against perpetuities, when the event on which the executory interest is limited to arise or to shift is not certain to occur within the permissible period.  Executory interests limited on an event certain to occur, however, require different consideration.  Thus, a grant "to *A* twenty-five years from date" involves no contingency except the passage of time.  Such an executory interest is not usefully regarded as "subject to a condition precedent."  It is, therefore, not subject to the common-law rule against perpetuities.  It causes no inconvenient fettering of alienability because of the existence of actuarial techniques for valuing both the preceding and the future interest.

10 POWELL ON REAL PROPERTY § 73.02[3].

The Koopmanns' interest in the NPRI could be deemed "vested" when it was created if that term is taken to mean that the holder of the interest was at all times ascertainable and the preceding estate was certain to terminate.  Executory interests have historically been subject to invalidation by the Rule when they were limited upon conditions precedent not certain occur, if ever, and followed a prior estate not certain to end.  *E.g.*, 3 POWELL ON REAL PROPERTY § 20.05.  But here, Strieber's fee simple interest in the NPRI was certain to end, either because production in paying or commercial quantities ceased, *see Clifton v. Koontz*, 325 S.W.2d 684, 691 (Tex. 1959) (discussing the standard to determine whether production in paying quantities was met to sustain lease), or the recoverable minerals were exhausted.  *See, e.g.*, *Amoco Prod. Co. v. Braslau*, 561 S.W.2d 805, 808 (Tex. 1978) (holding that a term royalty that is in the nature of a determinable fee will terminate when production ceases); 2 ERNEST E. SMITH & JACQUELINE LANG WEAVER, TEXAS LAW OF OIL AND GAS § 8.2 (2d ed. 2016) (discussing the point at which various mineral-production methods fail

17

due to inadequate resources).  Strieber reserved the NPRI for fifteen years and "as long thereafter as there is production in paying or commercial quantities"—a limitation certain to occur at some point.[6]  For these reasons, the Koopmanns' interest was more akin to a vested remainder when it was created because it was capable of becoming possessory upon the natural termination of a prior estate. *See Wells*, 57 S.W. at 598.  Once the lessee was no longer able to produce minerals in paying or commercial quantities, the NPRI would transfer to an ascertainable taker—the Koopmanns.

If instead of by reservation the Koopmanns had conveyed the NPRI interest to Strieber for fifteen years and as long thereafter as there is production in paying or commercial quantities, then the Koopmanns' interest would be classified as a possibility of reverter, which—though it is also a contingent future interest—would be presently vested and valid under the Rule.  *See Laddex*, 513 S.W.3d at 480; 3 POWELL ON REAL PROPERTY § 20.02[1].  We see no persuasive reason to treat the Koopmanns' future interest in the NPRI as uncertain and thus subject to invalidation by the Rule simply because it was created through a reservation rather than a grant, when the event upon which their interest will vest was certain to occur.

The court of appeals applied a legal fiction to hold that the Koopmanns' interest does not violate the Rule.  ___ S.W.3d at ___ (applying the "two-grant" theory developed in *Bagby*, 627 S.W.2d at 194–98).  The two-grant theory relies in part on a historical common law distinction

---

[6] We note that, in theory, production of an otherwise capable well could be delayed indefinitely if a producer maintains its lease under the terms of a savings clause.  However, in Texas a producer makes an implied covenant to develop a lease by drilling an initial well and reasonably develop after production has been obtained, and whether this duty is satisfied will be measured under the reasonably prudent operator standard.  *See generally Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 567 (Tex. 1981); *Koontz*, 325 S.W.2d at 695.  We therefore are not troubled by this purely theoretical possibility.

18

between "exceptions" and "reservations." *See Bagby*, 627 S.W.2d at 195. Traditionally, with an exception, the grantor was considered to have held something back. 6 THOMPSON ON REAL PROPERTY, SECOND THOMAS EDITION § 49.18 (David A. Thomas, ed., 2003). A reservation, on the other hand, was considered a "regrant," meaning that the deed passed the interest to the grantee and the reservation then passed it back to the grantor. *Id*. After concluding that Kuehn's (the grantor) deed made a reservation rather than an exception, the court in *Bagby* construed the deed as conveying the full mineral estate to Gerdes (the grantee), who in turn and by the same instrument, granted back to Kuehn a fee simple determinable in the NPRI. *Bagby*, 627 S.W.2d at 195–98. Because the grantee became a grantor under this fictional construction, the future interest immediately vested in the grantee as a possibility of reverter, thereby avoiding a Rule violation. *Id*. Here, the court of appeals applied the same fiction, concluding that like in *Bagby*, "Strieber's reservation of the NPRI creates a future interest in the Koopmanns that does not violate the rule against perpetuities." ___ S.W.3d at ___.

We see several problems with the two-grant theory. First, it ignores the traditional classifications of future interests—primarily, that a possibility of reverter cannot be held by anyone other than the grantor. *See, e.g.*, *El Dorado Land Co., L.P.*, 395 S.W.3d at 802; *Bradford v. Rain*, 562 S.W.2d 514, 518 (Tex. Civ. App.—Texarkana 1978, no writ); 3 POWELL ON REAL PROPERTY § 20.04[1][b]. Second, it is not clear that Strieber intended to reserve rather than except her NPRI interest. The deed uses both words ("There is EXCEPTED from this conveyance and RESERVED to the Grantor . . . ."), as do many modern deed forms. Bruce Kramer, *Property and Oil and Gas Don't Mix: The Mangling of Common Law Property Concepts*, 33 WASHBURN L.J. 540, 556 (1994).

19

Realistically, it is unlikely Strieber contemplated a distinction between withholding an interest and receiving the same interest from the Koopmanns; it is more likely that she simply intended to convey the tract while retaining her mineral interests by whatever words her lawyers said would be most effective. *See Earle v. Int'l Paper Co.*, 429 So. 2d 989, 993 (Ala. 1983). Finally, the two-grant theory relies on a legal fiction, something that is inherently outcome-oriented to reach a result that would otherwise be barred by the Rule. In holding that Strieber's deed made a reservation rather than an exception, the court of appeals appears to have relied in part on the canon of construction that where the instrument is capable of two constructions, preference is given to the construction that will not violate the Rule. *See* ___ S.W.3d at ___ (citing *Bagby*, 627 S.W.2d at 194). But the two-grant theory is not a canon of construction; it is a substitute for the written language of the instrument, created by the court to achieve a result that would not otherwise occur.

In *Peveto*, we held that a similar royalty conveyance violated the Rule. 645 S.W.2d at 772. That case dealt with two deeds: Jones first conveyed to Peveto an NPRI for fifteen years and "as long thereafter as" production continued, and later, Jones attempted to deed his possibility of reverter in the same NPRI to Starkey. *Id.* at 771. The second deed to Starkey included language that it would become "effective only on" expiration of the first deed to Peveto. *Id.* Although normally a grantor's possibility of reverter is alienable, we held that this specific language used in the second deed created a springing executory interest in Starkey that ran afoul of the Rule. *Id.* at 772. Because Starkey's interest would not vest until the first deed terminated, which could conceivably occur outside the Rule's time period, we held that the deed to Starkey was void. *Id.* Our opinion relied on the "effective only on" language in the second deed, and thus the language ending Peveto's

20

interest—"as long thereafter" as there was production—was not squarely before us. *See id.* We address that language for the first time here.

For the reasons stated above, it is appropriate to hold that in this oil and gas context, where a defeasible term interest is created by reservation, leaving an executory interest that is certain to vest in an ascertainable grantee, the Rule does not invalidate the grantee's future interest. As noted above, the Texas Constitution does not define "perpetuities," and without a statute on the subject, the common law on the matter is the law of the state. *Trustees of Casa View Assembly of God Church v. Williams*, 414 S.W.2d 697, 702 (Tex. Civ. App.—Austin, 1967, no writ); *Hunt v. Carroll*, 157 S.W.2d 429, 436 (Tex. Civ. App.—Beaumont 1941, writ dism'd); *see also* 12 B TEX. JUR. 3d Constitutional Law § 17 (2012) ("Constitutional construction is a matter for the courts."). The Rule developed at common law to prevent landowners from using remote contingencies to tie up land title and remove it from commerce indefinitely. *See Kettler*, 383 S.W.2d at 560. Our holding does not run afoul of the constitution's prohibition of perpetuities because the future oil and gas interest at issue here does not restrain alienability indefinitely—to the contrary, giving effect to a future interest that is certain to vest in a known grantee actually promotes alienability. *See Cherokee Water Co.*, 641 S.W.2d at 526; 2 OIL AND GAS LAW § 335; Burney, *supra*, at 45. Thus, because at the time it was created the Koopmanns' future interest in the NPRI was certain to vest and did not interfere with the Rule's purpose, we hold that the Rule does not invalidate this interest. We limit our holding to future interests in the oil and gas context in which the holder of the interest is ascertainable and the preceding estate is certain to terminate.

21

**B.  The Savings Clause**

Because we hold in the first part of this opinion that the Rule does not invalidate any part of Strieber's reservation, we must determine who held the interest in the NPRI at the expiration of the fifteen-year period.  It is undisputed that no well was actually producing on December 27, 2011, meaning that Strieber's interest in the NPRI continued beyond that date only if the savings clause was satisfied.

The savings clause contains three requirements: (1) there is a lease on the premises; (2) the lease is maintained in force and effect by payment of "shut-in royalties or any other similar payments made . . . in lieu of actual production"; and (3) there is a well "capable of producing oil, gas, or other minerals in paying or commercial quantities," but which is shut in "for lack of market or any other reason."  It is undisputed that Burlington held a lease on the tract on December 27, 2011, but the parties disagree as to whether the second or third requirements were met.  The trial court, in finding that Burlington's and Strieber's NPRI expired on December 27, impliedly found that the savings-clause requirements were not satisfied.  The court of appeals held that a fact issue existed concerning ownership of the NPRI because the savings-clause language regarding "other similar payments" is ambiguous as a matter of law, and it remanded the case to the trial court for a jury to decide its meaning.  ___ S.W.3d at ___.  We agree with the court of appeals that the savings clause is ambiguous.[7]

---

[7] Though the court of appeals noted that the parties' respective experts reached different conclusions as to whether there was a well actually *capable* of producing in paying quantities on December 27, 2011, and that this evidence created a fact issue left for the jury, it did not reverse the trial court's judgment on those grounds.  ___ S.W.3d at ___.  We agree that the evidence is inconclusive, and thus it is a fact issue for the jury.

22

We may construe a deed as a matter of law only if it is unambiguous. *J. Hiram Moore, Ltd. v. Greer*, 172 S.W.3d 609, 613 (Tex. 2005). The question of whether a contract is ambiguous is a question of law for the court. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Id.* In construing a contract, we must ascertain and give effect to the parties' intentions as expressed in the writing itself. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 805 (Tex. 2012). We give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense. *Heritage Res., Inc.*, 939 S.W.2d at 121. If the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, however, the contract is ambiguous, creating a fact issue on the parties' intent. *Id.*

A delay rental is a periodic payment made by an oil-and-gas lessee to postpone exploration during the primary lease term. *Delay Rental*, BLACK'S LAW DICTIONARY (10th ed. 2014); *Amber Oil & Gas Co. v. Bratton*, 711 S.W.2d 741, 743 (Tex. App.—Austin 1986, no writ). The purpose of a delay rental is to ensure that the lessee has no obligation to drill during the primary term by negating any implied obligation to test the premises. *See Tex. Co. v. Parks*, 247 S.W.2d 179, 182 (Tex. Civ. App.—Fort Worth 1952, writ ref'd n.r.e.). A "paid-up" lease is one under which all delay rentals bargained for are paid in advance, and this single payment maintains the lease during the primary term. 1 TEXAS LAW OF OIL AND GAS § 4.3[A][3]. A "shut-in royalty" is a payment made by a lessee to the lessor to keep the lease in force when a well capable of producing is not utilized because there is no market for the oil or gas. *Shut-in Royalty*, BLACK'S LAW DICTIONARY (10th ed.

23

2014); *BP Am. Prod. Co.v. Red Deer Res., LLC*, 526 S.W.3d 389, 395 (Tex. 2017). Payment of shut-in royalties is considered constructive production and will maintain the lease if its terms are satisfied. *Red Deer Res., LLC*, 526 S.W.3d at 395. Though generally paid during the secondary term, a lease providing for such payments may require them anytime a well is shut-in for lack of production, whether it is during the primary or secondary term. 3 OIL AND GAS LAW § 632.1 ("Most shut-in royalty clauses appear to be equally applicable during the primary and secondary term of the lease."); *see also Freeman v. Magnolia Petroleum Co.*, 171 S.W.2d 339, 341–42 (Tex. 1943) (holding that a lease terminated when there was a well capable of production before the end of the primary term but the lessee had not paid shut-in royalties until after the primary term ended).

Burlington concedes that a fact issue exists as to whether the well on Lackey Unit A was capable of producing on December 27, 2011, the end of the fifteen-year period. Both Burlington and Strieber assert, however, that the $24,000 payment Burlington made to the Koopmanns to extend the primary term of its lease on the tract is "similar" to a shut-in royalty and thus meets the third savings-clause requirement. Burlington argues the payment functioned similarly to a shut-in royalty because both would keep alive an existing lease in lieu of actual production. Further, because this was a "paid-up" lease, Burlington argues the $24,000 was essentially prepayment of delay rentals for two years and that delay rentals are widely recognized to be a type of payment similar to shut-in royalties. Strieber and the Koopmanns had no way of knowing whether a future lease would provide for rentals on a delayed basis or paid up front, and thus provided a savings clause keyed to payments made by a lessee during that time.

The Koopmanns, on the other hand, argue that the bonus payments cannot be considered "similar" to shut-in royalties because the two payments are tied to different parts of an oil and gas lease. Whereas a bonus payment is made to extend the primary term of a paid-up lease, the Koopmanns assert, a shut-in royalty is a payment made as a substitute for actual production. The Koopmanns offer examples of payments "similar" to shut-in royalties other than delay rentals or extension payments, arguing that any payment made during the secondary term in lieu of production would satisfy the requirement. Finally, when Burlington made the $24,000 payment, the Koopmanns argue, drilling operations had not even begun, and there was no well in existence necessitating *any* payments.

As the court of appeals noted, there are both similarities and differences between shut-in royalties, delay rentals, and paid-up leases, depending on the criteria used to compare them. ___ S.W.3d at ___. These payments function to extend the force and effect of an oil and gas lease through periods of nonproduction. 3 OIL AND GAS LAW § 631 (discussing shut-in royalties); *Amber Oil & Gas Co.*, 711 S.W.2d at 743 (discussing both). On the other hand, the timing of each is often different—delay rentals or payments to extend a lease's primary term are necessarily paid during the primary term, *see* 1 TEXAS LAW OF OIL AND GAS § 4.3[A][3], whereas shut-in royalties can be due during either the primary or secondary term. *See* 3 OIL AND GAS LAW § 632.1. We agree with the court of appeals that because there is more than one reasonable interpretation of "other similar payments" in the savings clause of Strieber's deed, the savings clause is ambiguous and thus creates a fact issue as to the parties' intent. *Cf. Greer*, 172 S.W.3d at 614 (holding that the trial court erred

in granting summary judgment when a deed was ambiguous and created a fact issue as to the parties' intent).

## C. The Texas Natural Resources Code

Burlington next challenges the court of appeals' holding that section 91.402(b) of the Natural Resources Code did not bar the Koopmanns' breach-of-contract claim, which arose from Burlington's suspension of royalty payments. *See* ___ S.W.3d ___. The trial court granted Burlington's summary judgment motion as to all of the Koopmanns' non-declaratory claims, but the court of appeals reversed as to the Koopmanns' breach-of-contract claim. *See id*. at ___. The court of appeals agreed that ownership of the NPRI was in dispute, but rejected Burlington's claim that section 91.402 barred the Koopmanns' non-declaratory claims. *Id*. at ___. First, noting that the statute was designed to protect royalty owners from unjustified payment delays by lessees, the court found that "no language in subsection (b) can be reasonably understood to bar non-declaratory claims as a procedural vehicle for enforcing section 91.402." *Id*. at ___. It next reasoned that accepting Burlington's interpretation of section 91.402 would mean that "a declaratory judgment would essentially become the exclusive remedy for a violation of section 91.402(a), which is inconsistent with the nature and purpose of a declaratory judgment." *Id*. at ___. The court of appeals affirmed the trial court's dismissal of the Koopmanns' other non-declaratory claims based on the economic-loss rule. *Id*. at ___.

The Koopmanns' breach-of-contract claim is based on the royalty clause in their lease with Burlington, which sets the amounts due on oil, gas, and all other minerals. The lease requires that the payments be made within sixty days after the end of the month in which production

26

occurred—an earlier payment than required under section 91.402—and requires interest on late payments. The Koopmanns did not assert a claim regarding withheld royalty payments under section 91.404, but they did seek prejudgment interest under section 91.403. *See* TEX. NAT. RES. CODE § 91.403 (providing for interest on late royalty payments).[8]

Burlington does not argue that it did not breach the lease agreement. It argues instead that section 91.402 "modified the common law rules that otherwise apply to oil and gas payments under leases, contracts, or deeds." The statute covers "payees" who are "legally entitled to payment" and "payors" who "undertake to distribute oil and gas proceeds"—both of which arise by virtue of contract—and thus, Burlington argues, the statute was intended to apply when contractual and leasehold rights are at issue. *See id.* § 91.401 (defining "payee" and "payor"). Further, by addressing timing of payments, excusing payors from making payments when there is a title dispute, and setting conditions for payment, Burlington asserts that the statute modifies parties' contractual rights and thus removes the Koopmanns' ability to prevail on a common law cause of action when the statute applies. Burlington points out that other parts of the Natural Resources Code explicitly state that those statutes do not override common law causes of action, but section 91.404(c) contains no such provision. *See, e.g.*, *id*. § 40.256 ("The remedies in this chapter are cumulative and not exclusive."). Burlington suggests this Court apply the interpretative canon of *expressio unius est exclusio alterius*—the notion that the express mention of one thing excludes another—to conclude that the Legislature intentionally did not include a similar provision here.

---

[8] The Koopmanns' negligence per se claim asserted that Burlington was negligent per se "in violating Section 91.402" by its failure to timely pay royalties. As noted above, it was dismissed, and the Koopmanns have not appealed that dismissal to this Court.

The Koopmanns do not fully respond to Burlington's arguments. They instead merely assert that section 91.402(b) is not intended to be a shield to liability, but serves only to extinguish pre-judgment interest, citing *Concord Oil Co. v. Pennzoil Exp. & Prod. Co.*, 966 S.W.2d 451, 461 (Tex. 1998). Additionally, the Koopmanns argue that there was no legitimate title dispute as to the NPRI. Citing *Browning Oil Co. v. Luecke*, 38 S.W.3d 625, 647–48 (Tex. App.—Austin 2000, pet. denied), they assert that this dispute falls outside of the chain of title and concerns only a failure to pay royalties.

This Court has instructed that "[a]brogating common-law claims 'is disfavored and requires a clear repugnance between the common law and statutory causes of action.'" *Cash Am. Int'l, Inc. v. Bennett*, 35 S.W.3d 12, 16 (Tex. 2000) (quoting *Holmans v. Transource Polymers, Inc.*, 914 S.W.2d 189, 192 (Tex. App.—Fort Worth 1995, writ denied)). "We have consistently declined to construe statutes to deprive citizens of common-law rights unless the Legislature clearly expressed that intent." *Id*; *see also Satterfield v. Satterfield*, 448 S.W.2d 456, 459 (Tex. 1969) (noting that a statute that deprives a person of a common law right "will not be extended beyond its plain meaning or applied to cases not clearly within its purview"). This Court has, however, found that a statutory claim may override a common law claim when the law governing the issue involves "a unique set of standards and procedures." *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 807 (Tex. 2010) (holding that the Texas Commission on Human Rights Act preempted an employee's common law negligence claim against her employer). This Court held last term that another portion of the Natural Resources Code that provides for a statutory cause of action did not exclude common law rights for the same harm. *Forest Oil Corp. v. El Rucio Land & Cattle Co., Inc.*, 518 S.W.3d 422, 429 (Tex.

28

2017) (analyzing section 85.321, which permits a landowner to sue for damages for violation of the subchapter's waste provisions). We stated: "[A]s the United States Supreme Court has observed, 'the force of any negative implication . . . depends on context.'" *Id.* (quoting *Marx. v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013)). "[T]he *expressio unius* canon does not apply unless it is fair to suppose that [the Legislature] considered the unnamed possibility and meant to say no to it." *Id.* (quoting same). Though it is "certainly *possible* to read a negative implication in Section 85.321," this Court noted, "it is hardly *necessary*." *Id.* (emphasis in original).

This Court has also upheld "Texas's strong public policy favoring freedom of contract." *Phila. Indemnity Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016). "Absent compelling reasons, courts must respect and enforce the terms of a contract the parties have freely and voluntarily entered." *Id.* (citing *Royston, Rayzor, Vickery, & Williams, LLP v. Lopez*, 467 S.W.3d 494, 503–04 (Tex. 2015)). As a general rule, parties may contract as they wish "so long as the agreement reached does not violate positive law or offend public policy." *Id.* at 475. In certain contexts where the Legislature sets certain rights and obligations between parties, it has explicitly allowed parties to contract around those rights to a certain extent. *See, e.g.*, TEX. BUS. ORGS. CODE § 152.002 (detailing the rights and duties a partnership agreement can and cannot waive); TEX. PROP. CODE § 92.061 (stating that these obligations and remedies are in lieu of existing common and statutory law, but that "[o]therwise, this subchapter does not affect any other right of a landlord or tenant under [any] contract"). In *White*, this Court construed the Property Code provision that imposes repair duties on landlords, noting: "[T]o the extent the Property Code imposes limitations on contracting in the leasehold-repair context, the Property Code reflects the Legislature's public-policy

29

determinations on the matter." 490 S.W.3d at 479 (discussing TEX. PROP. CODE § 92.061). We held, however, that the provision in the lease agreement at issue was not unenforceable per se because it could be performed without violating the Property Code, even though it was overly broad and could have encompassed scenarios in which a landlord would have had a nonwaivable statutory duty to repair. *Id.* at 483–84 ("The provision would be unenforceable per se only if it could not be performed without violating the Property Code.").

Natural Resources Code section 91.402 reads in pertinent part:

(a)     The proceeds derived from the sale of oil or gas production from an oil or gas well . . . must be paid to each payee by payor on or before 120 days after the end of the month of first sale of production from the well. . . .

(b)     Payments may be withheld without interest beyond the time limits set out in Subsection (a) of this section when there is:
(1)     a dispute concerning title that would affect distribution of payments;
. . . .

TEX. NAT. RES. CODE § 91.402(a)–(b). Section 91.404(c) reads:

(c)     A payee has a cause of action for nonpayment of oil or gas proceeds or interest on those proceeds as required in Section 91.402 or 91.403 of this code in any court of competent jurisdiction in the county in which the oil or gas well is located.

*Id.* § 91.404(c). The statute was passed in 1983, Act of May 24, 1983, 68th Leg., R.S., ch. 228, 1983 Tex. Gen. Laws 966 (codified as amended at TEX. NAT. RES. CODE §§ 91.401–.406), at a time when payment schedules were not included in leases:

Current law is totally vague as to deadlines for royalty payments. Most leases don't specify deadlines either, and there is no law specifically protecting Texas royalty owners from deliberate delay of their royalty checks. Many delays stem from legitimate questions about the validity of titles or the whereabouts of royalty owners. But some oil operators have raised title questions just to put off payments.

House Research Organization Bill Analysis, Tex. H.B. 1775, 68th Leg. R.S. (1983). We have recognized that the statute was "designed to protect the interest of royalty owners." *Concord Oil Co.*, 966 S.W.2d at 461. However, as Burlington points out, the statute also clearly contemplates protecting payors during legitimate title disputes. *See* TEX. NAT. RES. CODE § 91.402(b). In *Concord*, we held that the statute precluded a common law claim for prejudgment interest. 966 S.W.2d at 461–63. But that was a case in which there was not a contractual relationship between the parties—each was a producer arguing that it was entitled to the proceeds at issue. *Id.* at 453–54.

Burlington is correct that the statute imposes specific obligations on lessors and lessees: payment deadlines, payment conditions, interest rates, and excusal for non-payment when there is a title dispute. *See* TEX. NAT. RES. CODE § 91.402. Thus, it is possible that this "unique set of standards and procedures," *see Waffle House, Inc.*, 313 S.W.3d at 807, reflects the Legislature's public policy determinations on the matter. *See White*, 490 S.W.3d at 479. But we have required "clear repugnance" between a statutory and a common law cause of action to find that the former precludes the latter. *See Cash Am. Int'l, Inc.*, 35 S.W.3d at 16. As Burlington points out, the statute does not affirmatively state, as other parts of the Natural Resources Code do, that other common law causes of action are still available to disgruntled payees. *See e.g.*, TEX. NAT. RES. CODE § 40.256. Again, though it is "certainly *possible* to read a negative implication" in section 91.404(c), "it is hardly *necessary.*" *See Forest Oil Corp.*, 518 S.W.3d at 429.

Section 91.404(c) provides a cause of action for a payee if the payor does not comply with the requirements set out in section 91.402, but this does not mean that the statute abrogates a common law claim for breach of contract when there is a controlling lease between the parties. *See White*, 490

31

S.W.3d at 479.  Here, the parties agreed in several respects to terms different from what is suggested in section 91.402.  The Koopmanns claim that Burlington breached the terms of the lease when it failed to pay them royalties on the disputed NPRI, and absent clear language from the Legislature indicating an intent to abrogate a common law cause of action, we cannot hold that section 91.402 precludes their claim for  breach of contract.  We affirm the court of appeals' holding on this issue.

## D.  Burlington's Motion to Dismiss

The final issue in this case involves Burlington's motion to dismiss the Koopmanns' non-declaratory claims pursuant to Texas Rule of Civil Procedure 91a.  *See* TEX. R. CIV. P. 91a .  The trial court denied the motion to dismiss, but it later granted Burlington's motion for summary judgment on those claims.  In its final judgment, the trial court awarded $26,190.00 in attorney's fees to the Koopmanns under the loser-pays provision of Rule 91a.  *See* TEX. R. CIV. P. 91a .7.  The Koopmanns challenged the summary judgment on appeal.  The court of appeals affirmed as to the unjust enrichment (money had and received) and negligence claims, but as discussed above, reversed on the breach of contract claim.[9]  ___ S.W.3d___.  The Koopmanns did not appeal that ruling, and thus the court of appeals' judgment affirming the summary judgment is final and not before us.

Burlington now asks this Court to hold that the trial court erred in denying Burlington's motion to dismiss, even though the trial court ultimately granted Burlington summary judgment on those claims.  Burlington argues that because it made the same arguments against those claims in its motion to dismiss as it did in its later, successful summary judgment motion, the trial court erred in

---

[9]  The court of appeals did not address the Koopmanns' tortious interference claim, but as the Koopmanns have not challenged this omission to this Court, we do not address it here.

not dismissing the claims earlier. Therefore, Burlington asserts, it was error for the trial court to grant the Koopmanns attorney's fees under Rule 91a because Burlington was the "prevailing party" as to those claims. The Koopmanns respond that Burlington's motion to dismiss was filed late as to all but the negligence claims, *see* TEX. R. CIV. P. 91a.3 (requiring that a motion to dismiss be filed within sixty days after the first pleading containing the challenged cause of action), and the trial court did not err in its denial because those claims were not "frivolous." Burlington disagrees, asserting that its motion was timely because the Koopmanns' first attempt at alleging these claims was unintelligible. In the alternative, Burlington asserts that the court of appeals should have "at a minimum . . . reverse[d] the fee award against [Burlington] and [] remand[ed] the case for an allocation of fees and costs among the prevailing parties" as to the Koopmanns' negligence claims.[10]

Rule 91a provides that "a party may move to dismiss a cause of action on the grounds that it has no basis in law or fact." TEX. R. CIV. P. 91a.1. It also requires that, except in actions involving the government, "the court must award the prevailing party on the motion all costs and reasonable and necessary attorney fees incurred with respect to the challenged cause of action in the trial court." TEX. R. CIV. P. 91a.7. Here, the trial court denied Burlington's Rule 91a motion but later rendered summary judgment on the Koopmanns' non-declaratory claims. Apparently, Burlington is not

---

[10] The court of appeals rejected Burlington's argument for apportioning attorney's fees under Rule 91a on a claim-by-claim basis, reasoning that the Koopmanns "are still the 'prevailing party' with respect to the majority of the claims." ___ S.W.3d ___. We note that the official comment to Rule 91a states: "Attorney fees awarded under 91a.7 are limited to those associated with challenged cause of action, including fees for preparing or responding to the motion to dismiss." TEX. R. CIV. P. 91a.1, cmt. Thus, we see no basis for determining fees owed to a prevailing party based on which party won a "majority" of the claims. For the reasons stated, however, we do not reach the apportionment issue in this case.

satisfied, because it asks us to hold that the trial court erred in denying its motion to dismiss. We decline to do so.

First, Burlington's argument that it is the "prevailing party" under Rule 91a because it later won on summary judgment as to these claims is unpersuasive. Rule 91a provides that a party who files a motion to dismiss is due attorney's fees when it prevails "on the motion"—not on a later summary judgment motion asserting there is no genuine issue as to any material fact. *See* TEX. R. CIV. P. 91a.7; TEX. R. CIV. P. 166a. Further, it is irrelevant that the arguments Burlington made in its motion for summary judgment were the same as those it asserted in its motion to dismiss because a motion to dismiss is decided on the *plaintiff's* pleadings. TEX. R. CIV. P. 91a.6 (except in determining attorney's fees, "the court may not consider evidence in ruling on the motion and must decide the motion based solely on the pleading of the cause of action, together with any pleading exhibits permitted by Rule 59"); *City of Dall. v. Sanchez*, 494 S.W.3d 722, 724 (Tex. 2016) (per curiam). Finally, if we were to grant Burlington's request and hold that the trial court erred in denying its motion, this would effectively require us to vacate or overrule the trial court's summary judgment of these claims in Burlington's favor. We cannot do so when the court of appeals' affirmance of the summary judgment is final and not before us.

We note that Burlington could have challenged the trial court's denial of its motion to dismiss at the time it was denied. *See, e.g.*, *In re Essex Ins. Co.*, 450 S.W.3d 524, 526 (Tex. 2014) (reviewing a denial of a motion to dismiss on a petition for writ of mandamus); *GoDaddy.com, LLC v. Toups*, 429 S.W.3d 752, 753–54 (Tex. App.—Beaumont 2014, pet. denied) (reviewing a denial of a motion to dismiss under a permissive interlocutory appeal). It chose not to. We reject Burlington's argument

that it is entitled to recover attorney's fees as the prevailing party on the motion under Rule 91a when Burlington received an adverse ruling on that motion, did not challenge the ruling at that time, and later prevailed on its motion for summary judgment, which became final when it was not appealed to this Court.

### III. Conclusion

For the reasons set out above, we hold that the rule against perpetuities does not invalidate the Koopmanns' future interest in the NPRI created by Strieber's deed. We affirm that part of the court of appeals' judgment but on different grounds. However, we hold that the reservation's savings clause is ambiguous and affirm the court of appeals' remand on this issue. In addition, we hold that section 91.402 of the Natural Resources Code does not preclude a lessor's common law claim for breach of contract, and we affirm this part of the court of appeals' judgment. Finally, we decline to hold that Burlington is the prevailing party as to its motion to dismiss, and thus, we affirm the court of appeals' judgment as to attorney's fees pursuant to Texas Rule of Civil Procedure 91a.

Paul W. Green
Justice

OPINION DELIVERED: March 23, 2018